483 So.2d 999 (1986)
STATE of Louisiana
v.
John Henry WILLIAMS, Jr.
No. 85-K-1302.
Supreme Court of Louisiana.
February 24, 1986.
J. Michael McDonald, Jack M. Dampf, D'Amico, Curet & Dampf, Baton Rouge, for defendant-relator.
William J. Guste, Jr. Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., George Ware, Jr. Dist. Atty., Carl Jackson, Asst. Dist. Atty., for plaintiff-respondent.
DIXON, Chief Justice.
John Henry Williams, Jr. was tried for second degree murder of Garfield Branch, convicted of manslaughter, and sentenced to fifteen years at hard labor (including two years for using a gun in the killing). The court of appeal affirmed. State v. Williams, 470 So.2d 617 (La.App. 1st Cir. 1985).
Defendant claimed he shot Garfield Branch in self-defense. No one saw the shooting. The state called seven witnesses: two doctors, two police officers and three in-laws of John Henry.
The doctors had performed an autopsy on Garfield; they testified that he died from a gunshot wound in the left chest, and that the bullet perforated the heart, major blood vessels and other organs.
*1000 Defendant's in-laws who testified at the state's request were Jessie Mae Holmes, his mother-in-law of two weeks, Jessie Lee Williams, his sister-in-law (for fifteen years the common-law wife of Garfield Branch) and Melvin Williams, Jessie Lee's son by another union. Each told of the events of August 20, 1983 at about 7:30 or 8:00 in the evening.
Jessie Mae Holmes operated a small store in her home on a country road out from Clinton. Her home was next door to the house occupied by her daughter, Ruby, and John Henry, about one hundred fifty feet to the right (as seen while facing the road). A driveway separated the two houses, and they backed up to a thicket. John Henry and Ruby had married on August 5.
John Henry and Garfield had known each other for many years, having worked together part of the time. Their relationship was friendly until John Henry married Ruby, the sister of Jessie Lee, Garfield's longtime common law wife. John Henry had had an unexplained "affair" with Jessie Lee but had "stopped seeing" her six months before his marriage to Ruby. John Henry testified that Garfield told him Jessie Lee was "plumb sick over your marrying her sister." Five or six days after that marriage Garfield enticed John Henry into a room in a cafe at the side of Garfield's house, a few minutes' drive from the scene of the shooting, and beat John Henry severely. Garfield used a gun and his fists, and said he "ought to kill" John Henry.
Jessie Mae Holmes testified that defendant came into her store about 8:00 p.m. on August 20 to buy cigarettes and use the telephone. He had the phone in his hand and was getting his credit card to charge the call when Garfield drove down the drive. Jessie Mae and John Henry heard the car and saw it arrive. John Henry told Jessie Mae that he didn't want any run-in with Garfield because Garfield had beat John Henry up. The small house had a front and a back door. Jessie Mae saw defendant leave through the back door, turn left around the corner of her house and run toward the front, and testified that "the next thing I heard was two shots after he went out the back door." Jessie Mae went out the front, called for Garfield and got no answer. She saw defendant on the road, who said he was the one who fired the shots, and that Jessie should "call the law." Jessie did, and later found Garfield lying prone in the path between her house and Ruby's.
Melvin Williams arrived soon with Annette Davis, his aunt, and Jessie Lee Williams, his mother. He saw his "stepfather" lying about fifteen or twenty feet from his truck. Melvin checked Garfield, then went to his truck to look for the rifle Garfield had borrowed, but did not find the gun in the truck. However, Melvin touched the muzzle of the gun with his foot, as it lay on the ground, under the driver's door, with the stock under the truck. Melvin could find no bullets or shell casings. The gun was later taken from Melvin by the deputies.
Melvin and his mother Jessie Lee filled in the story of events immediately preceding defendant's arrival at Jessie Mae's. Jessie Lee was on her porch about 7:30 p.m. "or so. Garfield was in the house changing clothes preparing to take some corn, Jessie Lee and Annette to Jessie Mae Holmes' place. Jessie Lee saw John Henry drive down the highway; "he was waving or driving slow, or saying something." Shortly afterward, Garfield Branch left in his truck in the same direction as John Henry, without the women, saying only that he would be back soon. Ten or fifteen minutes later Jessie Lee received the phone call from her mother that Garfield had been shot.
The deputy and the Clinton Chief of Police testified about the crime scene and their interview with defendant. While at Jessie Mae Holmes' house they received a message that John Henry Williams had turned himself in. At the station they talked with John Henry, who admitted shooting Garfield, but claimed self-defense. The officers prepared a written statement which they said was "paraphrased." It was handwritten and signed by defendant and the officers. It follows:

*1001 "About 2 weeks ago Garfield Branch called me out to his house saying that his vedio (sic) machine was broke and when I got there he had me come inside; shut the door behind me and pulled a shotgun on me. Garfield started talking to me, telling me that his wife had told him that I use to go with her and that I had a lot of nerve marrying her sister. As he talk to me he hit me with the shotgun. We were in Garfield's game room alone and no one was in there with us. Then Garfield let me get out the door and Garfield said he ought to kill me. As I left I saw some children in the door at Garfield's house.
After I got off from work today, Aug. 20, 1983, I went by Robert Wenzy's house in Rileyville, Clinton, La. and he and I plus two more friends played dimino's (sic) and I drank 3 or 4 drinks of Vodka. I left Robert's house about 730 pm or 800pm, and drove home. As I passed Garfield's house on Hwy 961, two children spoke to me and I spoke back to them but I continued on driving to my house. When I got home I opened the house, turned on the air conditioner and then went over to my mother-in-laws (sic) house, Jessie Mae Holmes, who lives next door to me, to use the telephone to call my sister. I went into Jessie's house, spoke to her and sat down when a car started to come into the driveway. I asked her who that was and she said it was Garfield. I told her I was going to go. I went out the back door and he parked his truck along side of the house. I walked between the truck and the house to avoid him.
Garfield got out of the truck and said `Nigger don't you even speak to anyone at my house no more. I didn't teach you enough.' At that time Garfield pulled back from the truck. I didn't see nothing in his hands but I couldn't see his hands because he and I had the bed of the truck between us. I then raised my pistol and shot twice at him and ran toward the road in front of her house; sent down the edge of the road toward my house and came out at the edge of the bushes. I told Jessie to call the rescue unit and the Sheriff's Department and asked Jessie how he was; she said she didn't know, that Garfield may be dead. I then went and hid in the bushes because the family then came. I wanted to come out but was scared of the family. I came out later and came to the Sheriff's Office and gave myself up. I signed a search warrant and gave permission for Dy Messer & Bell to search my car where they recovered a silver .38 cal 2 shot Derringer F.I.E. SN# F17594 which is the gun I used to shoot Garfield Branch with."
The testimony of the officers did help to understand the statement as it was written. When defendant testified later, he insisted that part of the statement as recorded was inaccurate. The portion he criticized was: "At that time Garfield pulled back from the truck. I didn't see nothing in his hands, but I couldn't see his hands because ..." The testimony is clear that defendant tried to demonstrate Garfield's actions just before the shooting. That demonstration became "Garfield pulled back ..." It is not possible from the record to determine what motion Garfield made before he was shot.
John Henry testified that when he was in Jessie Holmes' store on August 20, 1983 a truck came down the road "kinda fast" and Jessie said, "It looks like Garfield to me." John Henry said, "I am going to go. I don't want to be in his company. Like that. `I will be back.' ... I was scared. I didn't want to get trapped up in that house."
Defendant testified:
"Q Then going back to what you said, there was a path between your house and that house?
A Right.
Q Where was the car parked?
A It was parked up near the path, kinda out from it like that, and after I seen the truck with parking lights on and the door was open on the other side and I didn't see nobody, so I just turned and *1002 walked like I am going to walk up the main road back out.
Q Why were you doing that?
A To avoid him. I didn't see him. I didn't know where he was.
Q Why did you want to avoid him?
A Cause I had told you he had fastened me up and beaten me and I was scared of him.
* * * * * *
Q Then what did you do after you were moving down the side of the truck?
A I turned and went back out to walk back down towards the road and I didn't see nobody. I didn't know where nobody was and I started back out and he hollered, `Hey, Nigger, don't holler at nobody, don't speak to nobody at my house.' I said, `Okay.' No, I said, `some kids spoke to me and I waved back at them.' He said, `I don't give a damn if they do speak to you, don't speak back to them.' I said, `Okay.' And I was steady trying to walk away from them to get round to the edge of the house.
Q Trying to get away from him?
A Right. So then he starts stepping sidways down the edge of the truck like this with his arms down.
* * * * * *
A He was stepping ... I was scared anyway ... he stepped on down and he said, `Nigger, I didn't teach you enough last time.' He jumped back and something flashed. It looked like a gun to me. I pulled and shot twice and ran.
Q Could you show us again the movement he made?
A He jumped back first.
Q Could you see his hands when he made that movement?
A I could not see his hands. Something flashed and it looked like a gun to me.
Q You thought it was a gun?
A Yeah, like a gun barrel coming up.
Q Did you aim at him when you shot?
A I didn't aim. I just shot the gun twice and ran.
Q Did you intend to shoot him?
A No, I was just trying to get away.
Q You didn't aim at all?
A No, I just did like that and took off. By the time I shot, I was running.
Q How many bullets in that kind of gun?
A Two.
Q Was there any time between your two shots?
A No, just like that and I was running when I shot the other time.
Q Just immediately?
A Yeah, I was on the run then.
..."
On cross examination defendant testified:
"Q Did you ever say, `I didn't see nothing in his hands, but I couldn't see his hands because he and I had the bed of the truck between us.'
A Something like that. Yeah, I think I said that.
Q What did you say?
A When he jumped back from the truck, I seen a flash that looked like a gun barrel or something he had in his hand the way his arms ... he hollered and jumped back and said he didn't teach me enough last time.
Q Could you see his hands?
A I couldn't see his hands.
Q Is it true here where you said I didn't see nothing in his hands?
A No, it is not. I couldn't see his hands.
Q What did you see in his hands?
A Something flashed looked like a gun to me. It just happened so quick. It wasn't nothing but a split second.
..."
On rebuttal the state called only Deputy Bell, who was asked only about a conversation he had with Mr. Thomas and his son, defendant's employers. There is no other evidence in the record to contradict the defendant or explain the killing.
Garfield weighed about two hundred fifty pounds. John Henry was only described as a man of "medium" build. Only five days after he married Ruby, Garfield *1003 trapped John Henry in a locked room and beat him severely with his fists and a gun and announced that he ought to kill John Henry because John Henry had married Garfield's common-law wife's sister. As far as the record discloses, John Henry's "affair" with Jessie Lee was never mentioned.
On August 20 John Henry, on his way home, drove past Garfield's house slowly while Jessie Lee and Annette and some children were out front. Someone waved, or spoke, or both. John Henry drove on. Garfield turned aside from his announced intention to visit Jessie Mae and take her some corn and left in his truck, saying only that he would be back soon. Contrary to the findings of the court of appeal, there is no evidence that defendant provoked the confrontation with the victim. (See State v. Williams, supra at 620). There was nothing about the physical evidence to indicate that defendant was the aggressor; the victim was armed and his gun was recovered under the truck at the open door on the driver's side; the only evidence about the victim's intent to harm defendant was defendant's own testimony, and all the evidence demonstrated defendant's fear for his safety; defendant was headed toward his own house to avoid a confrontation when Garfield appeared between defendant and defendant's house.
The homicide was justifiable and was committed in self-defense,[1] and no rational fact finder, viewing all the evidence in the light most favorable to the prosecution, could have concluded otherwise. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
The conviction and sentence are reversed and the defendant is ordered discharged.
WATSON, J., concurs and assigns reasons.
LEMMON, J., concurs.
MARCUS, J., dissents.
WATSON, Justice, concurring.
Although the evidence does indicate that this shooting was in self-defense, the issue is somewhat closer than it appears in the majority opinion. Victim Branch was estimated to be 5'5" to 5'7" tall. Obese rather than muscular, he weighed between 300 and 350 pounds. Branch's ".22 single shot rifle"[1] was unloaded and defendant Williams fired two shots with his two shot derringer. Williams was not completely sober at the time.
On the other hand, Branch had recently beaten Williams savagely with a gun and he was apparently holding the rifle when Williams shot him. Further, Williams was trying to avoid encountering Branch when his escape was blocked by Branch.[2]
I respectfully concur in the result reached by the majority.
NOTES
[1] "(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger; ..." R.S. 14:20(1).
[1] Tr. 137.
[2] At the sentencing hearing the testimony was that Williams was really "on the chicken side" (Tr. 330) and not an aggressive person.