942 So.2d 1099 (2006)
STATE of Louisiana
v.
Aaron GANT.
No. 06-KA-232.
Court of Appeal of Louisiana, Fifth Circuit.
September 26, 2006.
*1108 Charles C. Foti, Jr., Attorney General, Kristi D. Hagood, Molly L. Balfour, Assistant Attorney Generals, Baton Rouge, Louisiana, for Plaintiff/Appellee.
M. Michele Fournet, Baton Rouge, Louisiana, for Defendant/Appellant.
Panel composed of Judges CLARENCE E. McMANUS, WALTER J. ROTHSCHILD, and JAMES C. GULOTTA, Judge, Pro Tempore.
CLARENCE E. McMANUS, Judge.
The defendant, Aaron Gant, was charged by grand jury indictment with the second degree murder of Steven Riley, Jr., in violation of La. R.S. 14:30.1.[1] Defendant went to trial by jury and was found guilty as charged of the second degree murder. After the denial of his motion for post verdict judgment of acquittal, defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. This appeal followed.
FACTS
On the night of August 9, 2002, defendant fatally shot Steven Riley in Lutcher, Louisiana. At trial, defendant contended that he acted in self-defense. The following evidence was produced at the trial.
On the night of the shooting, James Jackson was driving a car rented by his mother. The defendant was in the front passenger seat, and Ferdinand Washington was in the back seat. Washington testified that he saw someone walking on the side of Project Road, with a cell phone at his ear. The defendant told Jackson to stop the car. Jackson stated that after he stopped the car, the defendant pulled a gun from "under his pants," as he opened the car door. As the defendant was exiting the car, he fired the gun twice without a pause. Jackson testified that he did not hear either the defendant or the victim say anything before the defendant fired the gun. Washington did not see the gun, but he heard the two shots as soon as the defendant got out of the car. Both men could not see anything, including whom the defendant fired at, because the windows of the car were tinted.
After the shots were fired, defendant got back into the car and said, "Go, go, go." Jackson immediately drove away, as Washington yelled to be let out of the car. The defendant told Washington to say that he had not seen him, and then Jackson let Washington out of the car. At that time, the defendant threw the gun into a ditch. Afterwards, Jackson and the defendant traveled to New Orleans.
Washington admitted that, in his first statement to the police, he said he was not at the scene of the shooting because he was scared and did not want to be involved.
Darren Johnson, his wife, Calibra, and Ernest Smith all testified that they heard gunshots on the night of August 9, 2002. Smith saw the victim walking his dog before the shots were fired. Calibra Johnson also saw the victim, on the corner walking his dog and talking on his cell phone a few minutes before she heard shots fired. When Smith stopped his truck less than a block away, he heard the shots. He looked back in the direction where the victim had been, and saw him lying on the ground. After the second shot went off, Darren and Calibra Johnson heard a car "spin off," and saw the victim lying on the ground, 10 to 12 feet from their home. Darren Johnson told the victim's father, *1109 Steven Riley, Sr., to take the cell phone out of his son's hand.
Both Smith and Darren Johnson saw a car at the scene of the shooting. Smith chased the car when it turned down King Avenue and he never lost sight of it. Eventually, he got close enough to see two people, a driver and a passenger, in the car and the license plate, which he gave to a Gramercy police officer. The plate was traced to an Enterprise rental car rented by Regina Jackson, James Jackson's mother.
Steven Riley, Sr. testified that, when he saw his son after the shooting, his son did not have a gun in his hand, but rather a shiny object that he pushed away from his son's body. Someone told him the shiny object that he saw was a gun, but he learned later was a cell phone. He testified that he did not remove a gun from his son's body contrary to his police statement. He admitted that he was very confused when he saw his son. Later, he learned that his niece, Kentra Riley, found a gun in her car, which was removed by her father, Marty Riley.
The victim's relative, Tamara Mitchell testified that the defendant told her that he was going to get the victim a week before the shooting. The defendant showed her the dried blood on his head caused by an injury he received when Riley and his friends beat him on the head with a belt buckle.
Detective Willie Taylor of St. James Parish Sheriff's Office testified that two shell casings from a 9mm handgun, a cell phone with an accompanying earpiece, and a bloodstain were found at the scene. A 9mm handgun, in the "cocked" position and a magazine were recovered from the canal at the intersection of Highway 3125 and King Avenue, in Lutcher. A suspect vehicle based on a description and the license plate was also recovered.
Detective Taylor testified that the defendant contacted the police in the early morning hours of the next day, because he wanted to talk. After the defendant was picked up, he gave three statements, at 7:50 a.m., 3:00 p.m.[2], and 5:00 p.m., on August 10, 2002. In the 7:50 a.m. interview, the defendant told him that he had not seen the victim on August 9, 2002. Instead, the defendant claimed that he was in Baton Rouge with his girlfriend. However, he did admit to being with Jackson and Washington on the date of the shooting. He also admitted that he was in a car on the night of the shooting with Jackson. The defendant claimed that he traveled to New Orleans around 10:00 p.m., and was not in Lutcher around 11:00 p.m. In the 5:00 p.m. interview, the defendant admitted that he hurt the victim. The defendant told Detective Taylor that he threw the weapon he used into the water. He stated that the weapon was in the cocked position with a magazine in it.
Detective Taylor also interviewed Juanita Lee. She stated that she was at the scene immediately after the incident, but was unclear if the victim had a weapon or a cell phone. However, she heard someone say something about a weapon. Detective Taylor learned that members of the Riley family were in possession of 22-caliber handgun, a Jennings firearm. He subsequently retrieved it from the residence of the decedent's grandmother, Rudy Riley. There was no evidence that the weapon was fired, therefore no ballistics tests were performed.
Dr. James Traylor, a forensic pathologist in the LSU Health Sciences Center's *1110 Pathology Department, testified that the autopsy of the victim revealed three gunshot wounds. Two of wounds grazed the body and the third penetrated it. One of the two grazing wounds was on the back of the victim's arm. Dr. Traylor opined that because of the soot deposit around the wound, the shot was fired in close proximity to the victim, no more than two or three inches away. The other grazing wound was on the left side of the victim's head. The fatal wound penetrated the left side of the victim's head. He opined that the bullet causing this wound penetrated the victim's head from back to front, left to right, and top to bottom from a distance of at least 16 to 18 inches or possibly farther.
ASSIGNMENTS OF ERROR
In his first assignment of error, the defendant alleges that the trial court erred in denying the Motion for Post-Judgment Verdict of Acquittal.
"A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty." LSA-C.Cr.P. art. 821(B). If the trial court or the appellate court "finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense." LSA-C.Cr.P. art. 821(C) and (E). An appellate review of the denial of the motion for post verdict judgment of acquittal is controlled by the standards set forth in Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Addison, 00-1730, p. 6 (La.App. 5 Cir. 5/16/01), 788 So.2d 608, 615, writ denied, 01-1660 (La.4/26/02), 814 So.2d 549.
The standard of review for determining the sufficiency of evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the State proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, supra. Under the Jackson standard, a review of a criminal conviction record for sufficiency of evidence does not require the court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. State v. Barnes, 98-932, p. 3 (La.App. 5 Cir. 2/10/99), 729 So.2d 44, 46, writ denied, 99-1018 (La.9/17/99), 747 So.2d 1099. Rather, the reviewing court is required to consider the whole record and determine whether any rational trier of fact would have found guilt beyond a reasonable doubt. Id. The trier of fact can accept or reject, in whole or in part, the testimony of any witness. State v. Baker, 01-1397, p. 3 (La.App. 5 Cir. 4/30/02), 816 So.2d 363, 365. It is not the function of the appellate court to second-guess the credibility of witnesses as determined by the trier of fact or to reweigh the evidence absent impingement on the fundamental due process of law. Id.
The evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Williams, 05-59, p. 4 (La. App. 5 Cir. 5/31/05), 904 So.2d 830, 833. When circumstantial evidence is used to prove the commission of the offense, LSA-R.S. 15:438 mandates that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." Id. It is not a separate test from the Jackson standard; rather it provides *1111 a helpful basis for determining the existence of reasonable doubt. State v. Harrell, 01-841, p. 5 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019. Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. Id. An appellate court does not determine whether another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events. State v. Williams, 904 So.2d at 833. Rather, the reviewing court must evaluate the evidence in a light most favorable to the State, and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. Id.
LSA-R.S. 14:30.1(A)(1) states that second degree murder is the killing of a human being when the offender has specific intent to kill or inflict great bodily harm. In order to prove second degree murder, the State must prove the killing and that the defendant had specific intent to kill or inflict great bodily harm. State v. Cazenave, 00-183, p. 6 (La.App. 5 Cir. 10/31/00), 772 So.2d 854, 859, writ denied, 00-3297 (La.10/26/01), 799 So.2d 1151.
Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." Id., LSA-R.S. 14:10(1). The determination of specific criminal intent is a question of fact. State v. Cazenave, 772 So.2d at 860. Specific intent may be inferred from the circumstances and actions of the defendant, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim's injuries. State v. Keating, 00-51, p. 4 (La.App. 5 Cir. 10/18/00), 772 So.2d 740, 743, writ denied, 00-3150 (La.10/12/01), 799 So.2d 494. The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill. State v. Hidalgo, 95-319, p. 9 (La.App. 5 Cir. 1/17/96), 668 So.2d 1188, 1197. Most cases in which evidence has been found sufficient to support an inference of specific intent have relied on the proximity of the gunman to the victim: close-range or point-blank. State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, 585. In addition, a defendant's flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. State v. Cazenave, 772 So.2d at 860.
A defendant can claim that the shooting was committed in self-defense, i.e. that the homicide was justifiable "[w]hen committed . . . by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." LSA-R.S. 14:20 A(1). Therefore, in a homicide case when a defendant claims self-defense, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. State v. Cazenave, 772 So.2d at 860.
The relevant inquiry on appeal is whether a rational fact finder, after viewing the evidence in the light most favorable to the prosecution, could have found, beyond a reasonable doubt, that the homicide was not committed in self-defense. The determination of Defendant's culpability focuses on a two-fold inquiry, whether, from the facts presented, Defendant could reasonably have believed his life to be in imminent danger, and whether deadly force was necessary to prevent the danger. While there is no unqualified duty to retreat from an *1112 altercation, the possibility of escape is a recognized factor in determining whether or not a Defendant had a reasonable belief that deadly force was necessary to avoid the danger.
Id., citing State v. Barnes, 729 So.2d at 46. (Citations omitted).
Furthermore, LSA-R.S. 14:21 states that "[a] person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." See also, State v. Cazenave, 772 So.2d at 860.
The defendant contends that because the victim severely beat him a week before the shooting, he was justified in his perception of danger when the victim had a gun, on the night of the shooting, citing State v. Williams, 483 So.2d 999 (La.1986). The State argues that it presented evidence from which the jury could have found that the defendant committed second degree murder, and was not acting in self-defense or in sudden passion or heat of blood.
In this case, the evidence showed that the victim was out walking his dog, and did not leave what he was doing to pursue the defendant. The defendant was the aggressor, choosing to stop a moving vehicle, get out, and shoot the victim before fleeing to New Orleans. Since the defendant was the aggressor and he did not withdraw from the conflict, he cannot claim self-defense. Thus, the jury could have reasonably concluded that the defendant was not in imminent danger of losing his life or receiving great bodily harm from the victim and that the killing was not necessary under the circumstances to save himself; and, therefore, found beyond a reasonable doubt that the defendant did not commit the homicide in self-defense.
Alternatively, the defendant argues that his conviction should be reduced to manslaughter. He claims that the victim beat him severely a week earlier, and later the victim went out of his way to make sure the defendant knew he had a gun. The defendant argues that seeing Riley with a gun, on the night of the incident, "re-ignited . . . anger and fear produced . . . by the earlier violent confrontations with [the victim]" causing him to act in sudden passion. The defendant cites the cases of State v. Bryan, 454 So.2d 1297 (La.App. 3 Cir. 8/23/84), writ denied, 458 So.2d 128 (La.10/12/84) and State v. Lombard, 486 So.2d 106 (La.3/31/86) to suggest that a manslaughter conviction would be more appropriate.
To reduce the second degree murder conviction to manslaughter, a lesser-included verdict, the defendant must prove:
A homicide which would be murder . . . (first degree murder . . . or . . . second degree murder), . . . [was] committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]
LSA-R.S. 14:31(A)(1); State v. Barbarin, 04-1094, p. 7 (La.App. 5 Cir. 3/1/05), 900 So.2d 95, 101.
The mitigatory factors of sudden passion and heat of blood may reduce the grade of the offense, if proven by a preponderance of the evidence. State v. Barbarin, 900 So.2d at 101. The mitigatory factors are not elements of the offense *1113 of manslaughter. Id. On appeal, the court must determine whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. Id.
A review of the record shows that the jury could have found that defendant did not commit the crime in sudden passion or heat of blood, as they could have found that the defendant's blood had time to cool in the week since the previous altercation. In brief, the defendant argues that his anger and fear caused by the previous violent confrontation were only "re-ignited" when he saw the victim with a gun that night. The jury was presented with direct evidence that suggested that the defendant began shooting as he exited the car. Thus, the jury could have found that even if the victim had a gun, the defendant formed the specific intent to kill him before he exited the car. In addition, the jury did not find that the defendant acted in self-defense to protect himself from the victim.
We find that the trial court did not err in denying defendant's motion for post-judgment verdict of acquittal.
In his next three allegations of error, the defendant argues that the trial court committed reversible error in denying his challenges for cause against Roxanne Becnel, Neva Aucoin, and Len LeBlanc. He claims that Becnel should have been dismissed for failure to accept the law as given to her by the trial court, and Aucoin and LeBlanc should have been dismissed because they had strong ties related to the prosecution.
The pertinent grounds upon which a juror may be challenged for cause, are set forth in LSA-C.Cr.P. art. 797.
The state or the defendant may challenge a juror for cause on the ground that:
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court[.]
See also, State v. Williams, 02-1188, p. 4 (La.App. 5 Cir. 4/8/03), 846 So.2d 22, 27.
In order to prove error warranting reversal of both the conviction and sentence, the defendant need only show that he exhausted all of his peremptory challenges and that the trial judge erroneously denied a challenge for cause.[3]State v. Williams, 846 So.2d at 28. The defendant must also show that he objected at *1114 the time that the trial court refused to sustain a challenge for cause of the prospective juror. State v. Jones, 884 So.2d at 589. Prejudice is presumed when a challenge for cause is erroneously denied by the trial judge and the defendant has exhausted his peremptory challenges. State v. Bozeman, 03-897, p. 4 (La.App. 5 Cir. 1/27/04), 866 So.2d 1029, 1032, writ denied, 04-0497 (La.7/2/04), 877 So.2d 141.
A trial judge is afforded great discretion in determining whether there has been cause shown to reject a prospective juror. State v. Williams, 846 So.2d at 28. The trial court "has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questioning." State v. Bozeman, 866 So.2d at 1032, citing State v. Anthony, 98-0406 (La.4/11/00), 776 So.2d 376, 392. A trial judge's determinations will not be disturbed on appeal unless a review of the voir dire as a whole indicates an abuse of discretion. State v. Williams, 846 So.2d at 28.
In the present case, the record shows that the defendant timely objected to the trial court's rulings denying his challenges for cause, and that he exhausted all of his peremptory challenges. However, the defendant has not shown that the trial court abused its discretion in denying the challenges for cause regarding Roxanne M. Becnel, Neva Aucoin, and Len LeBlanc.
Defendant first argues that the trial judge erred in denying his challenge for cause alleging Roxanne M. Becnel could not be fair and render a verdict of not guilty. He alleges that Becnel was unable to apply the law as it related to the self-defense, and the defendant's rights to a presumption of innocence and to remain silent. Therefore, Becnel should have been dismissed for failure to accept the law as given to her by the court, under LSA-C.Cr.P. art. 797(4), and the trial court's failure to dismiss her was reversible error.
An important part of a voir dire examination is to discover any prospective juror who may have difficulty understanding the defendant's right to the presumption of innocence, as well as to discover a juror who may hold it against a defendant who exercises his right. State v. Bozeman, 866 So.2d at 1033. A prospective juror's declaration of fairness and neutrality does not assure an understanding of the constitutional principle of the presumption of innocence. Id. When a prospective juror clearly asserts that he could not or probably would not apply the presumption of innocence that juror should be struck for cause unless rehabilitated. The failure of the trial judge to grant such a challenge is reversible error. Id. A prospective juror's responses indicating a lack of understanding of the law, i.e. self-defense, rather than bias is not grounds for cause because a juror is not expected to be familiar with legal terms or to understand jurisprudential distinctions given in an abstract context. State v. Taylor, 03-1834 (La.5/25/04), 875 So.2d 58, 63. A trial judge does not abuse the broad discretion vested in him in denying a challenge for cause of a juror who expressed a need for the defendant to produce some evidence on his own behalf in order to find him not guilty when the juror's response was caused more from a lack of understanding of the law than bias. State v. Shea, 421 So.2d 200, 205 (La.1982), rev'd on other grounds, 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985).
The defendant refers to two instances during the voir dire colloquy in which Becnel showed she misunderstood the concept of self-defense. He asserts that when asked if she understood the self-defense *1115 provision Becnel responded "Yes. I guess." Later, when given a hypothetical self-defense scenario, Becnel evaded the question by answering, "I believe each situation is different, but I would do anything [to get away]." In addition, the defendant claims that twice Becnel showed an inability to apply the defendant's right to a presumption of innocence. On first occasion, she responded that she could not return a not guilty verdict in a homicide case. On the second occasion, when asked if she could return a not guilty verdict, Becnel responded, "If I think he's guilty," and asked the penalty for the offense[4]. The defendant asserts that Becnel gave equivocal answers when the court attempted to rehabilitate her. Becnel also expressed difficulty with the defendant exercising his Fifth Amendment right to remain silent. When the defense asked if she would have difficulty if she did not hear anything from their side, Becnel responded, "I probably would. I would have to hear both sides."
In challenging the failure of the trial court to dismiss Becnel for cause, the defendant cites State v. Sylvester, 400 So.2d 640, 643 (La.1981) and State v. Turner, 96-845 (La.App. 3 Cir. 3/5/97), 692 So.2d 612, 614-617, writ denied, 97-2761 (La.2/20/98), 709 So.2d 773. In Sylvester, supra, the court found error in failing to dismiss for cause a prospective juror who steadfastly declared that she could not accept the theory of self-defense because of her religious beliefs. In Turner, supra, the court found error in failing to grant defendant's challenge for cause to excuse a juror who stated that she believed the defendant should have to prove he was innocent, despite the trial court's attempts to rehabilitate her.
The State argues that Becnel had no difficulty understanding the issue of self-defense once it was explained. The trial court found that Becnel expressed a willingness to listen to the evidence and follow the law.
In this case, Becnel's responses regarding the defendant's rights to be presumed innocent and to remain silent may have been caused more by a lack of understanding of the law than bias. See, State v. Taylor, 03-1834 (La.5/25/04), 875 So.2d 58, 63-64, in which where the Louisiana Supreme Court found that the juror's answers appeared to be from a lack of understanding of the exact burdens of proof in a homicide case where the defense is self-defense. The court found that in the juror's other responses indicated that he would follow the law as given, and agreed with the doctrine of justifiable homicide. The fact that the trial judge asked the juror if he would apply a reasonable person standard in imposing that burden of proof did not indicate that the juror would not correctly require the State to bear the burden of proof when ultimately given the proper jury instructions at trial. State v. Taylor, 875 So.2d at 63-64.
In addition, "individual jurors often, if not always, have their own inchoate or unarticulated predispositions." State v. Lucky, 96-1687 (La.4/13/99), 755 So.2d 845, 850. These personal predispositions do not offend the law, if they do not substantially impair the juror's duty to follow it, since not every predisposition or leaning in any direction rises to the level of substantial impairment. Id. The trial judge's broad discretion plays the critical role in the determination of whether there is substantial impairment. Id.
Here, the trial judge found that Becnel was "able to follow the law and render a verdict after listening to all of the evidence." *1116 The trial judge had the benefit of seeing Becnel's facial expressions and hearing her vocal intonations as she responded. Therefore, the trial judge did not abuse his discretion in denying the challenge for cause.
The defendant next argues that Aucoin and LeBlanc should have been dismissed pursuant to LSA-C.Cr.P. art. 797(2) and (3) because they had strong ties related to the prosecution.
A challenge for cause is not warranted, if a prospective juror, who has voiced an opinion seemingly prejudicial to the defense, after rehabilitation demonstrates the ability and willingness to decide the case impartially according to the law and evidence. State v. Bozeman, 866 So.2d at 1032. However, a trial judge should grant a challenge for cause, even when a prospective juror declares his or her ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render a judgment according to law may be reasonably implied. State v. Williams, 846 So.2d at 27. The Louisiana Supreme Court found that a prospective juror's association with law enforcement duties does not automatically disqualify the juror from service on a criminal jury, but rather it merits close scrutiny and may justify a challenge for cause. State v. Sylvester, 400 So.2d at 643. "Generally, an individual who will unquestionably credit the testimony of law enforcement officers over that of defense witnesses is not competent to serve as a juror." State v. Kang, 02-2812 (La.10/21/03), 859 So.2d 649, 652. A mere relationship between the prospective juror and a law enforcement officer is not of itself grounds to strike that juror for cause. State v. Kang, 859 So.2d at 653. A prospective juror's apparently prejudicial response is not grounds for an automatic challenge for cause. Id. A trial judge does not abuse his discretion in failing to excuse a prospective juror on the grounds of impartiality, if after further questioning the juror demonstrates a willingness and ability to decide the case impartially according to the law and evidence. Id.
In this case, the defense argues that Aucoin had strong ties related to the prosecution in this case and, therefore, should have been dismissed under LSA-C.Cr.P. art. 797(3).
Aucoin admitted that she knew a trial witness employed by the St. James Parish Sheriff's Office "in passing." When asked if she thought it would affect her ability to judge his credibility at trial, she replied, "I think he would be truthful." The defendant suggests that the trial court's efforts to rehabilitate Aucoin exacerbated the problem, and did not provide an answer on whether her relationship would influence her arriving at a verdict. The State argues that Aucoin only knew "in passing" one of the witnesses. The State claims that Aucoin stated that she did not know the witness personally and would treat him like any other person.
We find, from a review of the voir dire as a whole, especially considering the lack of any personal history with the potential witness, Aucoin was capable of serving as an impartial juror. Therefore, the trial court did not abuse its discretion in denying the challenge for cause.
Next, the defense argues that LeBlanc had strong ties related to the prosecution in this case and, therefore, should have been dismissed under LSA-C.Cr.P. art. 797(2) and (3).
LeBlanc admitted that he knew several people employed at the St. James Parish Sheriff's Office including his sister, friends, and two potential witnesses. In addition, LeBlanc's wife was employed by the district attorney's office. According to the *1117 defendant, LeBlanc admitted that these relationships had the potential to affect the way he would judge the case. The State argues that LeBlanc stated that he could put aside his relationships with law enforcement personal and other potential witness, and judge their credibility like any other witness.
We conclude that LeBlanc was capable of serving as an impartial juror, since he stated he would not judge the witnesses' testimony based on their friendship. Therefore, the trial court did not error in denying the challenge for cause.
A review of the voir dire as a whole does not indicate that the trial court abused its great discretion in denying the challenges for cause against Becnel, Aucoin, and LeBlanc. Defendant's allegations of error are without merit.
In his fifth allegation of error, the defendant argues that the trial court erred in denying his Batson[5] objection that the State impermissibly exercised its peremptory challenges to exclude potential jurors Cheryl Fay Charles, Marie Rose Ann Washington, Brenda Brown, and Ebony Brown based on their race.[6] The defense claims that the trial court's ruling did not meet the finding required by Batson that the defendant failed to establish a prima facie showing of race discrimination in the jury selection.
The State argues that the trial court found that the defense failed to establish a prima facie case of deliberate racial discrimination. Therefore, the burden never shifted to the State to offer a race-neutral reason for the strikes. The State notes that Louisiana jurisprudence has found that the number of strikes against minorities alone does not establish a prima facie case of racial discrimination.
The Equal Protection Clause of the Fourteenth Amendment guarantees a criminal defendant the right to be tried by a jury selected by nondiscriminatory criteria. State v. Lewis, 01-155, p. 3 (La.App. 5 Cir. 8/28/01), 795 So.2d 468, 471, writ denied, 01-2682 (La.8/30/02), 823 So.2d 939. The United States Supreme Court in Batson v. Kentucky, supra, found that the use of peremptory challenges based solely on a juror's race is prohibited. Id.
The United States Supreme Court established a three-step analysis to be applied when addressing a claim that peremptory challenges of a prospective juror were based on race and, therefore, exercised in a manner violative of the Equal Protection Clause. Batson, supra. First, a defendant must establish a prima facie case of discrimination by showing facts and relevant circumstances that raise an inference that the State used its peremptory challenges to exclude potential jurors based on race. Id. The party raising the Batson objection "need only produce `evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.'" State v. Elie, XXXX-XXXX (La.7/10/06), 936 So.2d 791, quoting Johnson v. California, 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005). The defendant may establish his prima facie case by offering any facts relevant to the question of the State's discriminatory intent to satisfy this burden. State v. Robinson, 04-964, p. 5 (La.App. 5 Cir. 2/15/05), 896 So.2d 1115, 1122. The facts include, but are not limited to, a pattern of strikes against members of a suspect class by the State, the statements or actions inferring that the peremptory strikes were motivated *1118 by impermissible considerations, the composition of the venire and the empaneled jury, and any other disparate impact upon the suspect class allegedly victimized by the purposeful discrimination. State v. Robinson, 896 So.2d at 1122-1123. If the defendant fails to establish a prima facie case, then the challenge fails. State v. Lewis, 795 So.2d at 471.
Second, if a prima facie case is established, then the burden shifts to the State to articulate a race-neutral explanation for its peremptory challenges. Id. To be facially valid, the prosecutor's explanation need not be persuasive or even plausible. Id. "The neutral explanation must be one which is clear, reasonably specific, legitimate and related to the particular case at bar". State v. Collier, 553 So.2d 815, (La.1989), citing Batson, 476 U.S. at 97-98, 106 S.Ct. at 1723. The State's explanation will be deemed race-neutral, unless discriminatory intent is inherent in its explanation. State v. Lewis, 795 So.2d at 471.
Third, if a race-neutral explanation is given, the trial court must determine whether the defendant has established purposeful discrimination. State v. Lewis, 795 So.2d at 471. At this stage, implausible or fantastic justifications may be found to be pretexts for purposeful discrimination. State v. Robinson, 896 So.2d at 1122-1125. The trial court must determine whether the proof offered by the defendant in meeting his burden of showing purposeful racial discrimination, in the State's exercise of peremptory challenges, when weighed against the State's proffered race-neutral reasons is strong enough to convince the court that the claimed discriminatory intent is present. State v. Lewis, 795 So.2d at 471. The trial court should focus on the intent of the State at the time the peremptory strikes were used, and whether the State offered sufficient race-neutral explanations for the peremptory challenges. State v. Robinson, 896 So.2d at 1123. The trial court should consider all other statements or actions by the State during voir dire to determine the discriminatory intent. Id.
Louisiana law codified this analysis in LSA-C.Cr.P. art. 795(C), which provides:
No peremptory challenge made by the state or the defendant shall be based solely upon the race of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror.
See also, State v. Stewart, 866 So.2d at 1021.
A trial judge's findings on a claim of purposeful discrimination are entitled to great deference by the reviewing court, because they depend largely on credibility evaluations. State v. Robinson, 896 So.2d at 1123; State v. Lewis, 795 So.2d at 471. The trial judge has the advantage of observing the characteristics and demeanor of the attorneys and prospective jurors. Therefore, the court occupies the best position for deciding whether a discriminatory objective underlies the peremptory challenges. State v. Robinson, 896 So.2d at 1123. An appellate court should not substitute their evaluation of the record for that of the trial judge. State v. Elie, citing Rice v. Collins, 546 U.S. ___, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006). However, a single instance of race or gender discrimination during the jury selection process, which is not identified and corrected by the trial court constitutes *1119 reversible error. State v. Lewis, 795 So.2d at 471; Batson, 476 U.S. at 95-96, 106 S.Ct. at 1722-1723.
In the present case, during the first panel the State exercised only two peremptory challenges to excuse two black jurors, Charles and Washington. The defendant did not raise a Batson challenge alleging a pattern of racial discrimination, therefore no race-neutral explanation was given for the challenges. However, the State exercised the peremptory challenge against Washington after its challenge for cause was denied. The State challenged Washington for cause alleging that Washington misunderstood reasonable doubt and wanted the State to prove more than the law required.
During the second panel, after the State exercised its next peremptory challenge against a prospective black juror, Ebony Brown, the defense raised a Batson objection. The defense alleged that the State had made four challenges all of which were against black jurors. The record indicates that the State made only three peremptory challenges before the defendant's Batson objection. However, the State indicated, at that time, that juror Brenda Brown was also being challenged.
After the defense made the Batson objection to the removal of the black jurors, the State offered the unsolicited explanation that Ebony and Brenda Brown were being challenged for lack of eye contact. The trial judge informed the State that it did not have to provide an excuse, since the defense had not shown a pattern of racial discrimination in the State's removal of the prospective jurors.
The trial judge ruled on the ultimate question of intentional discrimination finding that there was not a pattern of purposeful racial discrimination in the State's exercise of its peremptory challenges, after the State offered the race-neutral explanation of lack of eye contact for its peremptory challenges against Ebony and Brenda Brown. When the trial judge does not rule on whether defendant met his burden to establish a prima facie case of racial discrimination, but rules on the ultimate question of intentional discrimination after the State offers a race-neutral explanation for the peremptory challenge, the issue of whether defendant made a prima facie showing becomes moot. State v. Robinson, 896 So.2d at 1124.
The record indicates that the State made three peremptory challenges before the defense's Batson objection alleging that the State's four peremptory challenges were against four prospective black jurors. However, there is nothing in the record to suggest that the State tactically used these peremptory challenges in a racially discriminatory manner. A review of the entire voir dire shows that the State did not ask any questions related to race. While the defendant, on appeal, suggests that Charles and Washington may have been prosecution-oriented jurors, this does not prevent the State from exercising peremptory challenges against them. The State challenged Washington for cause, because she misunderstood the reasonable doubt standard and the State's burden of proof. Washington repeatedly expressed that she might have difficulty with reasonable doubt, because she might have a question in her mind that would not be asked and answered at trial. She also suggested that the feelings in her heart might affect her abilities to carry out her duties as a juror, related to something Washington said that her nephew was "going through," and that she has gone through in the past. The trial court denied the motion for cause, and the State, subsequently, exercised a peremptory challenge against Washington. The defense suggests that Ebony and Brenda Brown each gave a *1120 "very good definition" of self-defense in response to the only question asked them by State. However, the State did not challenge Brenda and Ebony Brown's understanding of the concept of self-defense, but rather offered the race-neutral explanation of lack of eye contact for exercising its peremptory challenges against them. This Court previously has found that trial courts have not abused their discretion in either accepting or refusing to accept failure to make eye contact as a race-neutral reason for peremptorily challenging a venire person. State v. Stewart, 03-920, p. 6 (La.App. 5 Cir. 1/27/04), 866 So.2d 1016, 1023, writ denied, 04-0449 (La.6/25/04), 876 So.2d 832; State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, 375. No explanation was requested or given for the removal of Charles. However, the defendant has not shown facts and relevant circumstances that prove that the State used its peremptory challenges to exclude Charles or the other three prospective black jurors based on their race creating a pattern of racial discrimination.
Considering the deference given to the trial court's credibility evaluation of whether there has been purposeful discrimination and the lack of a showing of purposeful racial discrimination in the State's exercise of peremptory challenges in the record, we find that the trial judge did not err in denying the defendant's Batson challenge.
In his sixth allegation of error, the defendant alleges that the trial court erred in denying his motion to suppress.
At trial, Detective Taylor testified that the defendant initiated contact with the police, in the early morning hours of the day following the shooting, because he wanted to talk. He was then picked up and brought in for questioning like others who had a connection to the case. Detective Willie Taylor testified that in the defendant's first statement, at 7:50 a.m., was video and audio taped. At the hearing on the motion to suppress, Detective Willie Taylor testified that the defendant could have left the office before the interview, because the defendant had not been arrested and was not in a secured area. The defendant also could have gotten up and walked out of the room during the interview. In his first statement, the defendant told him that he knew nothing about the shooting of Riley, and that he had not seen the victim that day. The defendant claimed to be out of town with his girlfriend. The first videotaped statement did not conclude until the defendant mentioned a lawyer, on several occasions. According to Detective Taylor, after the defendant was given his rights and told he did not have to answer questions, the defendant continued to talk after expressing a desire to talk to or call an attorney. Detective Taylor claimed that the defendant could have ended the conversation, because "He was free to go. He wasn't shackled. He could have gotten up and walked out of the room." In addition, Detective Taylor claimed that the defendant was not under arrest after the interview concluded and he was placed in the jail's library behind locked doors. The defendant could have called an attorney or walked out, after he told the jailers to let him go. A second videotaped statement, at 5:00 p.m., took place, because the defendant asked that Detective Taylor be contacted in order for the defendant to tell his side of the story.
At the suppression hearing, Detective Anthony Joseph of the St. James Sheriff's Office testified that he remained in the interview room during the defendant's first statement, until the defendant requested an attorney and did not want to continue the interview. The defendant was informed that he had the right to stop answering *1121 questions, but continued to talk after asking if he could call his lawyer. Detective Joseph stated that he was comfortable continuing the interview, because the defendant continued answering questions. The questioning continued until the defendant made a "full request" for an attorney and stated that he did not want to answer any more questions.
After a hearing on the defendant's motion to suppress, the trial court ruled that "when [the defendant] first asked for an attorney, then anything after that is not going to be allowed." Later, the trial court clarified that, "as soon as [the defendant] mentioned attorney in the first statement, from there on out, nothing was going to be allowed in."
Thereafter, the State filed notice under LSA-C.Cr.P. arts. 766, 767, and 768 of its intent to use the portion of the defendant's 7:50 a.m. statement previously ruled admissible, in its opening statement. The trial court allowed the admissible portion to be used in the State's opening statement.
On appeal, the defendant argues that the trial court erred in failing to suppress his entire first videotaped statement. He claims that the initial interrogation that produced the first videotaped statement was custodial. According to the defendant, after he was picked up and brought to the Sheriff's Office, he was not told why he was being questioned or that he could leave. He admits that he initially waived his right to have counsel, in the first interrogation, but changed his mind and requested counsel five times before the interrogation ceased. He claims that he sought to have the first videotaped statement suppressed, because it contained an outright denial that he was at the scene, which enabled the State to portray him as a liar and cite the statement as proof of guilt.
The State argues that case law does not support the suppression of the entire statement, as the defendant suggests, once the defendant invokes his right to counsel. The State notes that the defense only objected, at trial, to the jury seeing the entire tape, because the tape's poor sound quality might prevent the jury from hearing exculpatory evidence.
The defendant has the burden of asserting the basis for his motion to suppress. LSA-C.Cr.P. art. 703(E). State v. Jackson, 04-1388 (La.App. 5 Cir. 5/31/05), 904 So.2d 907, 911, writ denied, 05-1740 (La.2/10/06), 924 So.2d 162. The State is entitled to adequate notice in order to have an opportunity to present evidence and address the issue. Id. A defendant must raise the claim that his right to counsel was violated in either his motion to suppress or at the suppression hearing, because a defendant is limited on appeal to the grounds articulated in the trial court. State v. Merritt, 04-204 (La.App. 5 Cir. 6/29/04), 877 So.2d 1079, 1082, writ denied, 04-1849 (La.11/24/04), 888 So.2d 228.
Before an inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove beyond a reasonable doubt that the defendant was first advised of his Miranda rights, that he voluntarily and intelligently waived his Miranda rights, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement or promises. LSA-R.S. 15:451; State v. Franklin, 03-287, p. 3 (La. App. 5 Cir. 9/16/03), 858 So.2d 68, 70, writ denied, 03-3062 (La.3/12/04), 869 So.2d 817.
In Miranda v. Arizona, the United States Supreme Court held that the Fifth Amendment gives a suspect subject to custodial interrogation the right to *1122 consult with an attorney during questioning. State v. Payne, 01-3196 (La.12/4/02), 833 So.2d 927, 934; Miranda v. Arizona, 384 U.S. at 469-473, 86 S.Ct. at 1625-1627. The police are required to explain this right to the suspect before the custodial interrogation, "initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," begins. State v. Payne, 833 So.2d at 934, citing Rhode Island v. Innis, 446 U.S. 291, 298 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297 (1980), quoting Miranda v. Arizona, 384 U.S. at 444, 86 S.Ct. at 1612. The special procedural safeguards protect the privilege against compulsory self-incrimination in an "interrogation environment" created by the interplay of interrogation and custody that would "subjugate the individual to the will of his examiner." State v. Payne, 833 So.2d at 934, citing Innis, 446 U.S. at 299, 100 S.Ct. at 1688, quoting Miranda, 384 U.S. at 457-458, 86 S.Ct. at 1619. These safeguards regarding the Miranda right to counsel are triggered by both a custodial setting and an official interrogation. State v. Payne, 833 So.2d at 934. Custody is determined by "an objective assessment of the circumstances surrounding the interrogation to determine whether there is a formal arrest or restraint on freedom of the degree associated with formal arrest" and "an evaluation of how a reasonable person in the position of the interviewee would gauge the breadth of his freedom of action." State v. Manning, 03-1982 (La.10/19/04), 885 So.2d 1044, 1073, cert. denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005). The only relevant inquiry in the determination of whether there was a formal arrest or a restraint of freedom of movement to a degree associated with an arrest is how a reasonable man in the suspect's position would have understood the situation. State v. Maise, 99-734, p. 6 (La.App. 5 Cir. 3/22/00), 759 So.2d 884, 892. In deciding a reasonable person's perception of the situation, one must look at the viewpoint of an innocent person in his position. State v. Long, 03-2592 (La.9/9/04), 884 So.2d 1176, 1184, cert. denied, 544 U.S. 977, 125 S.Ct. 1860, 161 L.Ed.2d 728 (2005).
After a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning a suspect unless or until he clearly requests an attorney. Davis v. United States, 512 U.S. 452, 461, 114 S.Ct. 2350, 2356, 129 L.Ed.2d 362 (1994). A cessation of questioning is not required, if the suspect makes a reference to an attorney that is ambiguous or equivocal, which causes a reasonable police officer, in light of the circumstances, to understand only that the suspect might be invoking the right to counsel. State v. Payne, 833 So.2d at 935, citing, Davis v. United States, 512 U.S. at 458, 114 S.Ct. at 2355. In order to invoke his right to counsel, the suspect must articulate his desire to have counsel present with sufficient clarity to enable a reasonable police officer, in the circumstances, to understand his statement to be a request for an attorney. Id. See also, State v. Leger, XXXX-XXXX (La.7/10/06), 936 So.2d 108. The invocation of the right to counsel during the custodial interrogation "requires, at minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." State v. Payne, 833 So.2d at 935, quoting McNeil v. Wisconsin, 501 U.S. 171, 178, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158 (1991). In analyzing whether there has been a direct, clear, unequivocal, and unambiguous request for counsel, courts must give a broad, rather than narrow, interpretation to the suspect's request. State v. Payne, 833 So.2d at 936, citing, Michigan v. Jackson, 475 U.S. 625, *1123 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). Once a suspect has asked to have an attorney present, he is not subject to any further interrogation by the authorities until counsel has been made available to him, unless the suspect initiates further communication, exchanges or conversations with the police. State v. Payne, 833 So.2d at 935, citing Edwards v. Arizona, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). After the suspect has invoked his right to have counsel present during a custodial interrogation, a valid waiver of that right cannot be established by showing only that the suspect responded to further police-initiated questioning even if he has been advised of his rights. State v. Payne, 833 So.2d at 935, citing, Edwards v. Arizona, 451 U.S. at 484, 101 S.Ct. at 1884-1885. This prevents the police from badgering the suspect into waiving his previously asserted Miranda right. State v. Payne, 833 So.2d at 935, citing, Davis v. United States, 512 U.S. at 458, 114 S.Ct. at 2355.
The admissibility of a confession or statement is a determination for the trial court. State v. Franklin, 858 So.2d at 70. The ruling of the trial court will not be overturned unless the preponderance of the evidence clearly favors suppression. Id.; State v. Monroe, 00-1354, p. 6 (La.App. 5 Cir. 3/28/01), 784 So.2d 29, 35. In reviewing the trial court's ruling on the defendant's motion to suppress, an appellate court may consider pertinent evidence presented at the hearing on the motion to suppress and at trial. Id.
In the present case, the defendant does not claim that he was not advised of his Miranda rights or that he did not knowingly and voluntarily waive those rights. Instead, he claims that after waiving his rights he changed his mind and requested an attorney during the custodial interrogation. It is clear that the defendant was in a custodial setting. He was picked up by the police and brought to the station. It appears that the defendant was not free to leave. After he initially waived his right to counsel and was interrogated by the police, he requested counsel on five occasions during his first videotaped statement. After the first videotaped statement, in which he denied culpability, the defendant was placed in a locked portion of the jail. The defendant remained there until he contacted the Detective Taylor, and gave a second videotaped statement inculpating himself.
The defendant requested an attorney on five occasions during his first videotaped statement. On the first occasion, the defendant asks to call a lawyer. On second and third occasions, the defendant expresses a need for an attorney to help him during the interrogation. On the fourth and fifth occasions, the defendant appears to anticipate not only a need for an attorney during the interrogation, but also in court after being charged with the murder.
The Miranda special procedural safeguards are designed to prevent this type of interrogation environment in which an individual is subjugated to the will of the police, and in which the defendant's privilege against compulsory self-incrimination is endangered. A broad interpretation of the defendant's requests indicates the defendant's desire to have an attorney present during the interrogation. Therefore, the interrogation should have terminated when the defendant first requested an attorney. Since, the interrogation should have terminated, at that point, the trial court did not err in ruling that only the statements made after the initial request for an attorney was inadmissible.
After the videotape was played for the jury, the defendant re-urged his objection that portions of the tape were inaudible. *1124 The defendant noted that inaudible portions of the tape could have been favorable to him. The trial judge stated that the tape was in large part inaudible, because all three people on the tape talked at the same time, and that the problem was not the tape. The trial judge informed the defendant that if he found portions of the tape that were exculpatory, he would allow it to "somehow" be put into evidence. Later, the State informed the court that "instead of showing the rest of the tape, [the State] going to question the officer." Therefore, it is unclear whether the entire tape was played for the jury.
"An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." LSA-C.Cr.P. art. 841(A). A party alleging a trial error must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for that objection, in order to preserve the right to seek appellate review of the error. State v. Williams, 04-608 (La.App. 5 Cir. 11/30/04), 889 So.2d 1093, 1100, writ denied, 05-0081 (La.4/22/05), 899 So.2d 559. This contemporaneous objection rule puts the trial judge on notice of an alleged irregularity allowing the trial judge the opportunity to make the proper ruling and correct any claimed prejudice to the defendant. Id. This rule prevents a defendant from gambling on a favorable verdict at trial, and then later utilizing appellate review to correct errors that might easily have been corrected by the trial judge. Id.
The defendant only objected to the admission of the videotape because portions of it were inaudible, and did not raise a contemporaneous objection to the admission of the entire videotaped statement including the portions already ruled inadmissible by the trial court. Therefore, it is waived. See, State v. Manning, 885 So.2d at 1076, in which the Louisiana Supreme Court found that even if portions of the defendant's videotaped statement constituted prohibited other crimes evidence, the trial court did not err in failing to redact it, because the defendant did not object to its admission and thus waived any claim based on it.
We find no merit to the defendant's allegation that the trial court erred in denying the motion to suppress his statement of August 10, 2002, at 7:50 a.m.
In his seventh allegation of error, the defendant argues that the trial court erred in refusing its request to have its objections and the bench conferences transcribed. He claims that this error denied him a complete record, which in turn has deprived him of his right to appeal and judicial review. The defendant cites four bench conferences that were not transcribed. Two of the incidents occurred during trial. According to the defendant, one occasion involved his motion for a mistrial, and the other involved a hearsay issue. The remaining two occasions occurred during voir dire.
The State argues that Louisiana law does not specifically require that all bench conferences be transcribed. In addition, the State argues the defendant has not shown specific prejudice resulting from the failure to transcribe the bench conferences. Finally, the State notes that the defendant is not seeking his appeal on any issue related to the bench conferences.
LSA-C.Cr.P. art. 843 states in pertinent part:
In felony cases, . . . the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, *1125 questions, statements, and arguments of counsel.
Material omissions from the proceeding bearing on the merits of the appeal require reversal. State v. Parent, 02-835, p. 7 (La.App. 5 Cir. 12/30/02), 836 So.2d 494, 502, writ denied, 03-0491 (La.10/31/03), 857 So.2d 472. Inconsequential omissions from the transcript of the proceedings do not require reversal. Id. A defendant is not entitled to relief absent a showing of prejudice based on the missing portions of the transcript. Id. Therefore, an incomplete record may be adequate for appellate review. Id.
In State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, 586-587, writ denied, the Louisiana Supreme Court stated:
This court has never articulated a per se rule either requiring the recording of bench conferences or exempting them from the scope of La.Code Crim. Proc. art. 843. Still, art. 843's description of "objections" and "arguments" will normally apply only to objections made in open court and the arguments of counsel in closing, because only these objections and arguments rise to a level of materiality sufficient to invoke art. 843. Similarly, Art. I. § 19's command to record "evidence" does not encompass bench conferences, at least, not ones that do not satisfy the materiality requirements of La.Code Crim. Proc. art. 843.
(Citations and footnotes omitted). See also, State v. Parent, 836 So.2d at 502-503.
In the present case, the defendant has not raised an assignment of error, on appeal, relating to these four bench conferences. The defendant has not shown that the omissions were material, that these conferences had a discernible impact on the proceedings, or that he has been prejudiced by the failure to record these four bench conferences, because they bear on the merits of his appeal. We find no merit to the defendant's allegation, since the record is sufficient for this Court to make a meaningful review on appeal.
We have also reviewed the record for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990), and find the following error.
The trial court did not inform the defendant that he had two years after his judgment of conviction and sentence became final to seek post-conviction relief, as required by LSA-C.Cr.P. art. 930.8(A). Therefore, we remand the case to the trial court and order the court to inform the defendant of the appropriate prescriptive period for filing for post-conviction relief by sending appropriate written notice to the defendant after the rendition of this Court's opinion and filing written proof that the defendant received the notice in the record. State v. Hutchinson, 02-60 (La.App. 5 Cir. 5/15/02), 817 So.2d 500, 509.
For the above discussed reasons, the defendant's conviction and sentence are affirmed. We remand the case to the district court with instructions for the trial court to correctly inform the defendant of the prescriptive provisions for seeking post-conviction relief.

CONVICTION AND SENTENCE AFFIRMED; CASE REMANDED.
NOTES
[1] James Jackson and Ferdinand Washington, Jr. were also indicted as accessories after the fact. The co-defendants are not part of this appeal
[2] This was a taped telephone conversation between the defendant and Detective Taylor. The conversation occurred at 3:00 p.m., according to Detective Taylor's testimony.
[3] La. Const. art. 1, § 17 states that a criminal defendant has the right to challenge jurors peremptorily and that the number of challenges shall be fixed by law. State v. Carmouche, 01-0405 (La.5/14/02), 872 So.2d 1020, 1028. In a trial for an offense punishable by imprisonment at hard labor, the defendant has twelve peremptory challenges. LSA-C.Cr.P. art. 799; Id. An erroneous ruling of the trial court that deprives a defendant of one of his peremptory challenges constitutes a substantial violation of a constitutional and statutory right requiring reversal of the defendant's conviction and sentence. LSA-C.Cr.P. art. 921; State v. Jacobs, 99-1659 (La.6/29/01), 789 So.2d 1280, 1284.
[4] Actually, Becnel did not ask what the penalty would be, but rather expressed that she did not know the punishment. The defense attorney responded that it would be life in prison.
[5] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
[6] The four jurors are African-American.