# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                                    NEWS RELEASE #031

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **27th day of June, 2025** are as follows:

**PER CURIAM:**

*2023-K-01549*          *STATE OF LOUISIANA   VS.   KAYLA JEAN GILES COUTEE (Parish of Rapides)*

REVERSED; VACATED; AND REMANDED WITH INSTRUCTIONS. SEE PER CURIAM.

Weimer, C.J., dissents for the reasons assigned by Justice Guidry and assigns additional reasons.
Hughes, J., concurs and will assign reasons.
Crain, J., concurs and assigns reasons.
Guidry, J., dissents and assigns reasons.
Knoll, A.H.J., dissents.

# SUPREME COURT OF LOUISIANA

## No. 2023-K-01549

## STATE OF LOUISIANA

## VS.

## KAYLA JEAN GILES COUTEE

### On Writ of Certiorari to the Court of Appeal, Third Circuit, Parish of Rapides

**PER CURIAM**[*]

We granted writs to examine whether Defendant's convictions and sentences were correctly affirmed by the court below, particularly in light of the legislatively created presumption in Louisiana's stand-your-ground law. After reviewing the record, we find they were not. Specifically, we find the complained-of jury instructions constitute reversible error. Given our findings, we do not address Defendant's other assignment of error.

It is undisputed that Defendant shot and killed her estranged husband, Thomas Coutee, Jr., ("Thomas") at the end of their child custody exchange in an Alexandria Wal-Mart parking lot, on September 8, 2018. The jury found her guilty as charged of second degree murder and obstruction of justice. They rejected her defense under the stand your ground provision of La. R.S. 14:20. The evidence at trial included testimony from those who knew both parties, law enforcement officers, witnesses at the scene, and the forensic pathologist who performed the autopsy on Thomas's body, as well as surveillance video from a nearby Sonic restaurant, and a video recording of Defendant's statement to police after the shooting. Additional evidence

---

[*] Chief Judge John Michael Guidry, was appointed Justice ad hoc, sitting for Justice Scott J. Crichton, for oral argument. He sits as an elected Justice at the time this opinion is rendered.

Justice Jeanette Theriot Knoll, retired, heard this case as Justice Pro Tempore, sitting in the vacant seat for District 3 of the Louisiana Supreme Court. She is now appearing as an ad hoc for Justice Cade R. Cole.

indicated Defendant deleted her social media accounts and online research about vehicular stand-your-ground scenarios.

The trial court denied Defendant's motion for new trial and sentenced Defendant to the mandatory term of life imprisonment plus a consecutive term of 30 years for obstruction of justice. The Third Circuit affirmed. *State v. Coutee*, 2022-0665 (La. App. 3 Cir. 10/25/23), 373 So.3d 486.

Defendant now disputes the following: whether the evidence is sufficient to support the verdicts, including whether the State proved beyond a reasonable doubt that Defendant was not justified in shooting Thomas; whether the inclusion of a jury instruction on the aggressor doctrine was reversible error; whether two prospective jurors should have been removed for cause; and whether trial counsel rendered ineffective assistance.

The evidence, when viewed in the light most favorable to the prosecution, must be sufficient to convince a rational factfinder that all elements of the crime were proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676, 678 (La. 1984). Because Defendant does not dispute that she shot and killed Thomas and instead claims she was justified under La. R.S. 14:20, the central issue for the jury to decide was whether the State carried its burden of proving beyond a reasonable doubt that the homicide was not justified. *See State v. Williams*, 483 So.2d 999, 1003 (La. 1986).

A person using force in response to entry or attempted entry into their dwelling or vehicle need not believe she is in danger of losing her life; rather, she need only reasonably believe the use of deadly force is necessary to prevent an intruder's unlawful entry or to compel an intruder to leave a protected place. *State*

*v. Revish*, 2015-0470, p. 7 (La. App. 1 Cir. 11/9/15), 185 So.3d 8, 13, *writ denied*, 2015-2247 (La. 5/20/16), 191 So.3d 1066.

In an A(4)(a) stand-your-ground scenario, as Defendant claims existed here, La. R.S. 14:20 B creates a legal presumption that:

> a person lawfully inside [the] dwelling, place of business, or motor vehicle held a reasonable belief that the use of deadly force was necessary to prevent unlawful entry thereto, or to compel an unlawful intruder to leave the dwelling, place of business, or motor vehicle when the conflict began, if both of the following occur:
>
> (1) The person against whom deadly force was used was in the process of unlawfully and forcibly entering or had unlawfully and forcibly entered the dwelling, place of business, or motor vehicle.
>
> (2) The person who used deadly force knew or had reason to believe that an unlawful and forcible entry was occurring or had occurred.

The remaining portions of the justifiable homicide statute provide that:

> C. A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force as provided for in this Section, and may stand his or her ground and meet force with force.
>
> D. No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving life or great bodily harm or to prevent the unlawful entry.

La. R.S. 14:20 C and D. The statutory language is blunt, strong, and clear.

The body of jurisprudence on the Louisiana stand-your-ground law is scant. In *State v. Wilkins*, 2013-2539 (La. 1/15/14), 131 So.3d 839, this Court observed that a person may choose to defend herself using deadly force, under the circumstances in R.S. 14:20 A, *without considering whether retreat or escape is possible*. In other words, a person who acts under A(1), A(2), A(3), or A(4) may stand her ground and

3

meet force with force, without considering whether to flee instead.[1] The State must disprove beyond a reasonable doubt the presumption provided by law.

It bears emphasis that Defendant and Thomas were in the midst of a contentious divorce and custody dispute. Thomas had filed for divorce in June of 2018 and, at the time of his death, was seeking reconsideration of a family court order requiring him and Defendant to continue sharing custody of their child, T.C., the two-year old girl present at the scene (along with her two older half-sisters from Defendant's past relationships). The Defendant had sought a protective order against Thomas and there was evidence of domestic abuse in their relationship. The record shows that even though she had researched self-defense laws she had subsequently had multiple custody exchanges without incident.

According to the defense, Defendant acted justifiably in firing her gun at Thomas because she was lawfully inside her vehicle, ready to leave, when Thomas approached and opened her driver's door. She told 911 dispatch, first responders, and investigators all the same thing: She fired out of fear. In further support of this contention, Defendant emphasizes the following evidence: her statements during the divorce and custody proceedings in June and August of 2018 in which she claimed Thomas had called her demeaning names, "jumped at her," slammed a car door on her leg, and threatened to call police and have her put in jail; and, her statements to the family court that Thomas was stalking and harassing her, trying to provoke her at custody exchanges, and had himself begun carrying a weapon.[2]

---

[1] *Wilkins* made clear the provisions at C and D make explicit that there is no duty to retreat when a person acts pursuant to one of the scenarios in A, and the possibility of retreat shall not be considered by the jury in assessing reasonableness. *Wilkins*, 2013-2539, p. 3, 131 So.3d at 840.

[2] The evidence shows their relationship was in total disarray during the summer of 2018. There was evidence to support Defendant's allegation that Thomas had been stalking her: a photo of Defendant eating with another man was recovered from Thomas's phone, along with a message in which Thomas asked someone named James Glenn to run a license plate for him.

4

Defendant also relies on her statement after the shooting, which was played for the jury, in which she said she bought the gun to defend herself, got a self-defense insurance policy to be a responsible gun owner, and pulled the trigger only because she was afraid.[3] She also cites testimony from Thomas's mother, Cathy Pearson, that she knew Thomas to carry a weapon, and from Defendant's sister, that she saw Thomas with a weapon when he picked up his daughter on a prior occasion. According to Defendant, her statement after the shooting was consistent with what her seven-year-old daughter (from a prior relationship) told CAC interviewers, and what the surveillance video from a neighboring Sonic restaurant shows transpired.

In particular, Defendant describes the shooting as happening after she was already inside her car with the door shut, ready to drive away. She says Thomas returned and "jerked" her door open. Within seconds, Defendant fired her gun at him, she claims this act was out of fear and to prevent entry into her vehicle.

Defendant argues she is entitled to the legal presumption that she reasonably believed deadly force was necessary under La R.S. 14:20 B, and that the evidence shows she was reasonably fearful: Thomas was an amateur MMA fighter, six feet tall (to her 5' 1"), and nearly twice her weight. According to Defendant's statement, Thomas had knocked her out on a prior occasion and had been harassing her in recent months. In addition, Defendant's sister testified that Thomas had been violent in the past and that Defendant was fearful in the weeks before the shooting.

The Court of Appeal analysis largely relied upon cases involving traditional self-defense situations. It did not properly apply La. R.S. 14:20 B's directive that this Defendant benefits from a legal presumption that she held a "reasonable belief that the use of deadly force was necessary to prevent unlawful entry thereto, or to

---

[3] As agreed by the State during oral arguments, gun ownership and self-defense insurance policies are not in and of themselves criminal activities. Indeed, the legislature recently legalized concealed carry without the necessity of a permit.

5

compel an unlawful intruder to leave."

The trial court also instructed the jury on the aggressor doctrine by advising:

A person who is **the aggressor** or who brings on a difficulty **cannot claim the right of self-defense unless she withdraws from the conflict** in good faith and is in such a manner that her adversary knows or should know that she desires to withdraw and discontinue the conflict.

In determining whether the defendant was the aggressor, you must consider the nature of the confrontation and whether the victim's actions were a reasonable response. Thus, if you find the defendant was the aggressor or that she brought on the difficulty, you must reject her claim of self-defense unless you find: One, that she withdrew from the conflict; and, Two, that her withdrawal was in good faith; and, Three, that the withdrawal [sic] in a manner that put her adversary on notice that she wished to withdraw and discontinue the conflict.

(Emphasis added). As the Court of Appeal observed, "[t]he State also suggested that Defendant had her weapon in hand and effectively ambushed the victim[.]" *Coutee*, 2022-0665 p. 18, 373 So.3d at 500. The Third Circuit also correctly found that "there was no testimony that directly demonstrated Defendant had the gun in her hand in advance" but then inexplicably held that "the jury could safely conclude that the act of pulling a gun on someone without provocation is an inherently aggressive act." *Id.*

This analysis imports concepts that turn the express statutory provisions of La. R.S. 14:20 B-D on their head. Defendant was in her car when the car door was opened by her ex-husband. The Sonic video tends to verify this.

The appellate court's approach seriously undermines both our state's "stand your ground" laws and our citizen's Second Amendment rights. To presuppose that Defendant, sitting in her own car, was the aggressor as this particular jury charge implies, reintroduces a duty to withdraw and undermines the instruction concerning the legal presumption. In fact, the charge declares the Defendant to be the aggressor when that is a fact determination for the jury. The aggressor doctrine charge, when

6

there was no evidence she was the aggressor, materially conflicts with the provisions of La. R.S. 14:20.

Under the harmless-error test of *Chapman v. California,* 386 U.S. 18, 23-24, 87 S.Ct. 824, 827-28, 17 L.Ed.2d 705 (1967), the question is whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." In *Sullivan v. Louisiana,* 508 U.S. 275, 280, 113 S.Ct. 2078, 2082, 124 L.Ed.2d 182 (1993), the Supreme Court clarified that the inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Id.*, 508 U.S. at 279; *State v. Wells*, 2014-1701 (La. 12/8/15), 209 So. 3d 709, 717-18 (internal citations omitted).

The Court of Appeal found this charging error to be harmless. We disagree. The State bears the burden of proving beyond a reasonable doubt that the killing was not justified. Under these facts, Defendant is allowed to benefit from the La. R.S. 14:20 presumption. In this context, the erroneous charge does not support a finding that "the guilty verdict actually rendered in this trial was surely unattributable to the error." *Sullivan,* 508 U.S. at 279. Therefore, the conviction of second-degree murder must be vacated.

### *Obstruction of Justice Conviction and Sentence*

The issues related to the defective aggressor doctrine charge do not call into question the conviction for obstruction of justice. A conviction under La. R.S. 14:130.1 may exist independently of the other. However, the Court of Appeal's opinion fails to analyze the Defendant's assignment of error that the trial evidence was insufficient for her obstruction of justice conviction. It makes no mention of this assignment of error at all and does not reach a conclusion on it. Therefore, this matter is remanded to the Third Circuit for proper consideration of this assignment of error.

7

The acts of this Defendant consist of giving her personal laptop to her sister and later instructing her sister to give it to a friend. If this conviction is affirmed on remand the Court of Appeal is also instructed to reconsider the assignment of error that the 30-year sentence was excessive.

Finally, Defendant maintains the trial court erred when it denied her motion for new trial, which rested in part on her argument that counsel rendered ineffective assistance by failing to consult an expert in intimate partner violence. Given our findings above, we need not consider Defendant's ineffective assistance of counsel claim.

For the foregoing reasons, we reverse the court of appeal's decision, vacate Defendant's second degree murder conviction and sentence, and remand for further proceedings; remand for the court of appeal to consider whether the trial evidence was sufficient to support Defendant's obstruction of justice conviction and; if the conviction is affirmed, the court of appeal is further instructed to reconsider the unaddressed assignment of error that the 30-year sentence was excessive.

**REVERSED; VACATED; AND REMANDED WITH INSTRUCTIONS.**

# SUPREME COURT OF LOUISIANA

## No. 2023-K-01549

## STATE OF LOUISIANA

## VS.

## KAYLA JEAN GILES COUTEE

*On Writ of Certiorari to the Court of Appeal, Third Circuit, Parish of Rapides*

**WEIMER, C.J., dissents for the reasons assigned by Guidry, J. and assigns additional reasons.**

The majority vacates Defendant's conviction based on the trial court including a jury instruction that an aggressor cannot claim self-defense. Finding no error in the trial court's jury instruction on the aggressor doctrine, I must respectfully dissent.

The central issue in this case is whether Defendant was justified in shooting and killing her ex-husband. Defendant asserted a defense under the "stand your ground" provision of La. R.S. 14:20(A)(4)(a), arguing she reasonably believed the use of deadly force was necessary to prevent her ex-husband's unlawful entry into her vehicle. The State took the position that Defendant premeditated the shooting and fabricated the self-defense story. The trial court provided the jury with instructions on Defendant's justified homicide defense, as well as the aggressor doctrine. Considering the facts and evidence adduced at trial, I find the trial court did not err in providing a jury charge on the aggressor doctrine.

In this case, the jury was tasked with deciding whether to credit defendant's theory that she used deadly force justifiably under La. R.S. 14:20(A)(4)(a) and (B) because she did so as her ex-husband sought to forcibly enter her car, or the State's theory that she had already decided to kill him, taken steps to research and plan her actions, and essentially laid in wait to shoot him after the custody exchange. Evidence was presented to support both theories, but it was ultimately the State's burden to prove that Defendant did not act justifiably.

Simply instructing the jury on the aggressor doctrine did not "presuppose" or "declare" Defendant to be the aggressor, as claimed by the majority. Instructions on justifiable homicide and the aggressor doctrine are not mutually exclusive, and the trial court was correct in providing both instructions. The charge provided the jury with applicable law consistent with the evidence presented by the State that Defendant's actions were not taken with a reasonable belief that deadly force was necessary. It was for the jury to decide whether to apply the presumption that Defendant was reasonable in her belief that deadly force was necessary (La. R.S. 14:20(B)), whether the state carried its burden of proving Defendant did not act justifiably, and ultimately whether Defendant was guilty of murder. Evidence that Defendant was the aggressor is germane to the jury's ultimate determination of guilt. The jury had the obligation to follow the law as given, and, in taking its responsibilities seriously, the jury capably applied that law to the facts presented.

Notably, in finding the jury charge constituted reversible error, the majority opinion states the charge conflicted with the provisions of La. R.S. 14:20 because there was no evidence Defendant was the aggressor, apparently blindly accepting Defendant's assertion that there was "no evidence" whatsoever that she was the aggressor or that she did anything to bring on the difficulty. However, a review of the record demonstrates the Defendant and majority opinion mischaracterize the evidence.

As Justice Guidry correctly points out, the jury heard substantial circumstantial evidence indicating Defendant planned and orchestrated the shooting. I outline the evidence in more detail later in this dissent when discussing sufficiency of the evidence, but it is important to emphasize some of the evidence presented to refute the justifiable homicide defense. Evidence demonstrated Defendant had been planning the shooting for weeks. Approximately two weeks prior to the shooting,

defendant conducted several Google searches on guns, "Louisiana self-defense spouse," "Louisiana Jordan Thornhill,[1] self-defense," "Louisiana Self-defense laws," "concealed carry insurance," "arrested after self-defense" and "self-defense inside car." Although Defendant attempted to erase traces of her searches, forensics specialists were able to recover her research. Shortly thereafter, and despite being subject to a protective order which prohibited her from owning or possessing a firearm, Defendant travelled out of state to purchase a gun (and provided an untruthful answer on the federal form regarding the existence of the protective order). Moreover, a security camera video capturing the shooting shows Defendant reacted to her ex-husband *walking* up to her vehicle by immediately drawing a gun and firing at him. Forensics testimony was presented that Defendant would have had the gun in hand, essentially ready and waiting, thereby countering Defendant's narrative that she pulled the gun out and shot in self-defense after her ex-husband jumped towards her and jerked the car door open. For all we know – and we really do not know – Defendant called her ex-husband over to her car. In addition, even if her ex-husband said unpleasant or unkind words to her, as Defendant told the investigator, those words were not tantamount to an act of physical aggression.

The evidence of Defendant's preparation and premeditation, as well as evidence regarding the timing and mechanics of the shooting itself, could obviously lead a reasonable juror to find Defendant was the aggressor. In a case in which the parties had competing theories of what transpired, it was for the jury to decide who initiated the aggression. The court's jury instruction on the aggressor doctrine did not suggest anything to indicate *whether* the Defendant was the aggressor and correctly left that question for the jury to decide. The trial court had a duty under

---

1 Jordan Thornhill was shot and killed in 2012 by Daniel Jones, who was acquitted after claiming self-defense, justifiable homicide.

3

La. C.Cr.P. art. 802(1) to charge the jury on all the applicable law, including "every phase of the case supported by the evidence whether or not accepted [] as true." **State v. Marse**, 365 So.2d 1319, 1323 (1978). Trial courts are given broad discretion in formulating jury instructions, which must fairly and reasonably point out the issues and provide correct principles of law for the jury to apply to those issues. See **State ex rel. Collier v. State**, 16-0671, p. 3 (La. 8/4/17), 222 So.3d 699, 700. Given the trial court's duty to instruct the jury on all relevant law and considering that the court gave instructions on both justifiable homicide and the aggressor doctrine, I find the trial court did not abuse its discretion and correctly provided the jury with a complete and appropriate guide for its deliberations.

Even if the trial court's instruction on the aggressor doctrine could be considered erroneous (which I do not concede), such error would be subject to a harmless error analysis. See **State v. Gaddis**, 36,661, p. 9 (La. App. 2 Cir. 3/14/03), 839 So.2d 1258, 1266; **State v. Eskano**, 00-101, pp. 15-16 (La. App. 5 Cir. 1/30/01), 779 So.2d 148, 155-56. The instruction was not itself determinative of any fact— i.e., it did not instruct the jury that Defendant was the aggressor, nor did it negate the jury instruction on justifiable homicide. Moreover, considering the extent of evidence demonstrating the shooting was premeditated and planned, and therefore not self-defense, it could not be said that the guilty verdict was surely attributable to the alleged jury charge error. *Id*. ("[T]he appropriate standard for determining harmless error is whether the guilty verdict was surely unattributable to the jury charge error.") The guilty verdict was certainly supported by the evidence presented at trial.

Furthermore, I would uphold Defendant's convictions, finding no merit in her additional assignments of error challenging the sufficiency of the evidence to support the verdicts, including whether the State proved beyond a reasonable doubt

that Defendant was not justified in shooting Thomas, and whether two prospective jurors should have been removed for cause.[2]

### I. Sufficiency of the evidence.

The evidence, when viewed in the light most favorable to the prosecution, must be sufficient to convince a rational factfinder that all elements of the crime were proven beyond a reasonable doubt. **Jackson v. Virginia**, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); **State v. Captville**, 448 So.2d 676, 678 (La. 1984). Because Defendant does not dispute that she shot and killed Thomas and instead claims she was justified under R.S. 14:20(A)(4)(a), the central issue for the jury to decide was whether the State carried its burden of proving beyond a reasonable doubt that the homicide was not justified. See **State v. Williams**, 483 So.2d 999, 1003 (La. 1986).

> A homicide is justifiable under the so-called stand-your-ground provision,
>
> When committed by a person lawfully inside a dwelling, a place of business, or a motor vehicle as defined in R.S. 32:1(40) when the conflict began, against a person who is attempting to make an unlawful entry into the dwelling, place of business, or motor vehicle, or who has made an unlawful entry into the dwelling, place of business, or motor vehicle, and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the dwelling, place of business, or motor vehicle.

La. R.S. 14:20(A)(4)(a).

This provision differs from (A)(1) of the same statute, in that a person using force under (A)(4)(a) need not believe she is in danger of losing her life; rather, she need only reasonably believe the use of deadly force is necessary to prevent an intruder's unlawful entry or to compel an intruder to leave a protected place. **State**

---

[2] Defendant also makes an ineffective assistance of counsel claim; however, I agree with the majority that such claim should be relegated to post-conviction proceedings.

**v. Revish**, 2015-0470, p. 7 (La. App. 1 Cir. 11/9/15), 185 So.3d 8, 13, *writ denied*, 15-2247 (La. 5/20/16), 191 So.3d 1066.

In an (A)(4)(a) stand-your-ground scenario, as Defendant claims existed here, La. R.S. 14:20(B) creates a

> presumption that a person lawfully inside [the] dwelling, place of business, or motor vehicle held a reasonable belief that the use of deadly force was necessary to prevent unlawful entry thereto, or to compel an unlawful intruder to leave the dwelling, place of business, or motor vehicle when the conflict began, if both of the following occur:
>
> (1)    The person against whom deadly force was used was in the process of unlawfully and forcibly entering or had unlawfully and forcibly entered the dwelling, place of business, or motor vehicle.
>
> (2)    The person who used deadly force knew or had reason to believe that an unlawful and forcible entry was occurring or had occurred.

The remaining portions of the justifiable homicide statute provide that:

> C.    A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force as provided for in this Section, and may stand his or her ground and meet force with force.
>
> D.    No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving life or great bodily harm or to prevent the unlawful entry.

La. R.S. 14:20(C), (D).

A reviewing court must therefore determine whether a rational factfinder, after viewing all the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the homicide was not justified. **State v. Matthews**, 464 So.2d 298, 299 (La. 1985). In applying this standard, a reviewing court does not assess witness credibility nor reweigh evidence. **State v. Rosiere**, 488 So.2d 965, 968 (La. 1986). Instead, it is a jury's role to judge witness credibility, and this Court does not second-guess credibility determinations even where the

evidence contains discrepancies. **State v. Stockstill**, 19-1235, p. 6 (La. 10/1/20), 341 So.3d 502, 507. When there is conflicting evidence, the resolution of which depends on a credibility determination, the question is one of the weight of the evidence, not its sufficiency. **State v. Bowers**, 51,545, p. 14 (La. App. 2 Cir. 8/9/17), 244 So.3d 586, 594, *writ denied*, 17-1637 (La. 6/15/18), 257 So.3d 685.

A person may choose to defend herself using deadly force, under the circumstances in R.S. 14:20(A), without considering whether retreat or escape is possible. **State v. Wilkins**, 13-2539 (La. 1/15/14), 131 So.3d 839. Thus, a person who acts under at (A)(1), (A)(2), (A)(3), or (A)(4) may stand her ground and meet force with force, without considering whether to flee instead. Nevertheless, it is for the jury to decide whether the evidence satisfies the applicable La. R.S. 14:20(A) provision, including the requirement that the person standing her ground reasonably believe it necessary to resort to lethal force. For example, the defendant in **State v. Gasser**, 18-0531, p. 5 (La. App. 5 Cir. 7/3/19), 275 So.3d 976, 981–82, *granted on other grounds*, 19-1220 (La. 6/3/20), 296 So.3d 1022, *conviction vacated on other grounds*, 18-531 (La. App. 5 Cir. 7/15/20), 307 So.3d 1119,[3] admitted shooting the victim after the two engaged in mutual road rage. The **Gasser** defendant claimed justification under the same provision at issue here, (A)(4)(a), because, according to him, he shot the victim when the victim aggressively approached him inside his car, and the victim "lunged into his vehicle with his upper body and hands," verbally threatening to kill the defendant. **Gasser**, 18-0531, p. 6, 275 So.3d at 982. Despite Gasser's statement that when he fired his gun, the victim's hands and head were inside Gasser's vehicle, the jury rejected his stand-your-ground defense and credited other evidence which indicated that, at most, the victim's hand had touched Gasser's open window frame. The appellate panel noted the jury rationally found insufficient

---

[3] Gasser's conviction was later vacated under **Ramos v. Louisiana**, 590 U.S. 83 (2020).

proof of an unlawful entry or attempted unlawful entry, as mandated by (A)(4)(a). Because there was insufficient evidence that the victim had tried to enter his vehicle, Gasser was not entitled to the presumption at R.S. 14:20(B) that he had reasonably believed deadly force was necessary. **Gasser**, 18-0531, p. 14, 275 So.3d at 987.

Even if Gasser had been entitled to that presumption, the court of appeal concluded the jury rationally found the State's evidence had rebutted it. *Id.*, 18-0531, p. 15–18, 275 So.3d at 987–90. The court also addressed the companion provisions at (C) and (D) and reasoned that, even accepting that Gasser had no duty to retreat while lawfully inside his vehicle, the amount of force he exerted must have nevertheless been reasonable under the circumstances. *Id.*, 18-0531, p. 16–17, 275 So.3d at 988–89. The court of appeal likened the R.S. 14:20(A)(4)(a) reasonableness standard to one of proportionality, *i.e.*, the amount of force exerted by the alleged intruder must be weighed against the accused's response to it. *Id.* In finding the evidence showed Gasser's response was disproportionately violent, the court noted that the victim was unarmed and that Gasser admitted he never saw the victim produce or brandish a weapon. *Id.*, 18-0531, p. 18, 275 So.3d at 989. Because the only evidence indicating the victim had unlawfully or forcefully entered Gasser's vehicle was Gasser's own self-serving statements, the jury rationally credited other evidence indicating the use of lethal force was unreasonable, including that the victim was not shot at close enough range to create stippling at the wound site. *Id.*

**Gasser** drew on **State v. Ingram**, 45,546, p. 1 (La. App. 2 Cir. 6/22/11), 71 So.3d 437, 440–41, *writ denied*, 11-1630 (La. 1/11/12), 77 So.3d 947, in which the defendant was found guilty of manslaughter for shooting his unarmed ex-wife while she was engaged in a brawl with his current wife, after she entered his home uninvited. Even though his ex-wife had unlawfully entered his home, as contemplated at (A)(4)(a), the State rebutted the presumption that the defendant had

8

reasonably believed deadly force was necessary to compel her to leave, especially in light of evidence that the victim was unarmed and evidence indicating the defendant was angry with her about their pending community property settlement. **Ingram**, 45,546, pp. 11–12, 71 So.3d at 445–46.

Defendant's position is that she was justified in firing the gun at Thomas because she was lawfully inside her vehicle, ready to leave, when Thomas approached and jerked open her driver's door and she fired the gun out of fear. A review of the record demonstrates the following.[4]

Hours after the shooting, Defendant's seven-year-old daughter (from a prior relationship), A.S., told CAC interviewers repeatedly that Thomas had "jumped at" her mother before she fired the gun. She said she saw a cloud of smoke in front of Thomas before he fell back, bumping against his truck. At trial three years later, however, A.S. contradicted her initial statement and testified that she had not seen either her mother or Thomas during the moments before nor when Thomas was shot. A.S. and her other sister were entering Thomas's truck, facing into his vehicle's interior. Nevertheless, A.S. told the jury, "I believe Thomas was walking up to mama whenever I heard the gunshot, but I don't know. I think he took a few steps and bam." She clarified that Thomas was "slowly walk[ing]."

A.S. also testified that she did not hear any heated words nor see any violence that day, nor had A.S. on any prior occasion ever seen Defendant or Thomas with a gun. A.S. testified that although she had previously witnessed them argue, she had never seen Thomas hit the Defendant. But she had seen Defendant hit Thomas in the face on one prior occasion. A.S. verified she was truthful in her testimony, but she also confirmed on cross-examination that she had been truthful in the CAC interview, which the jury heard. Given that A.S. was a very young witness who

---

[4] The majority opinion recites some of the same evidence and arguments made by Defendant.

9

partially contradicted herself, the jury may have rationally given her account less weight than other evidence presented at trial.

Among that evidence, Defendant pointed to statements during the divorce and custody proceedings in June and August 2018 in which she claimed Thomas had called her demeaning names, "jumped at her," slammed a car door on her leg, and threatened to call police and have her put in jail; and she told the family court that Thomas was stalking and harassing her, trying to provoke her at custody exchanges, and had begun carrying a weapon.

Defendant also relies on her statement after the shooting in which she said she bought the gun to defend herself, got a self-defense insurance policy to be a responsible gun owner, and pulled the trigger only because she was afraid. She also cites testimony from Thomas's mother that she knew Thomas to carry a weapon, and from Defendant's sister, that she saw Thomas with a weapon when he picked up his daughter on a prior occasion. According to Defendant, her statement after the shooting was consistent with what A.S. told the CAC interviewer, and what the surveillance video from a neighboring Sonic restaurant shows transpired.

Defendant describes the shooting as happening after she was already inside her car with the door shut, ready to drive away. She says Thomas returned and "jerked" her door open. Within seconds, Defendant claims she fired her gun at him out of fear and to prevent his entry into her vehicle. In her brief to this Court, she emphasizes there was a gap of three to four seconds between Thomas arriving at her door and falling backward, which she urges refutes the State's theory that she sat ready to open fire.[5]

---

[5] Notably, her argument has evolved from the trial court level. Review of her motion for a post-judgment verdict of acquittal indicates she previously described the shooting as happening only "a moment" after Thomas opened her door.

Defendant argues she reasonably believed deadly force was necessary under La. R.S. 14:20(B), and that the evidence shows she was reasonably fearful: Thomas was an amateur MMA fighter, six feet tall (to her 5' 1"), and nearly twice her weight. According to Defendant's statement, Thomas had knocked her out on a prior occasion and had been harassing her in recent months. In addition, Defendant's sister testified that Thomas had been violent in the past and that Defendant was fearful in the weeks before the shooting. However, her sister conceded she had never witnessed any abuse. Defendant had only informed her about it.

Defendant also emphasizes she did not flee after the shooting, as would indicate a guilty conscience, but remained on the scene, called 911, and stayed with her children until police arrived. Under these circumstances, where Thomas was attempting to enter her vehicle, she urges the State failed to rebut the presumption that she reasonably believed deadly force was necessary, and therefore no rational fact finder could have found the shooting was not justified. She reiterates the lesser standard of (A)(4)(a), whereby she need not have believed she was in danger of losing her life and was instead entitled to use deadly force to prevent his entry or compel him to leave.

On the other hand, the State asserts it carried its burden of proving the killing was not justified. The State urges there was nothing beyond Defendant's own self-serving statement to indicate Thomas had forcibly entered or attempted to forcibly enter her vehicle. The State submits the court of appeal correctly characterized the Sonic surveillance video and found it disproved Defendant's claim that Thomas forcefully jerked open her door. **Coutee**, 22-665, p. 8, 373 So.3d at 494.

Rather, as the jury saw firsthand, the State submits the video shows Thomas walking casually to Defendant's vehicle and then promptly being shot in the chest. Thus, according to the State, the evidence allows for one of two scenarios: either (1)

11

Thomas was approaching slowly enough that defendant had ample time to draw her weapon from its holster and fire upon his arrival, in which case Thomas was not acting aggressively or "forcibly"; or (2) Defendant preemptively had her gun drawn and sat ready to fire, as part of her premeditated plan. Either way, the State asserts there is a plethora of evidence from which the jury rationally found it rebutted any presumption to which Defendant may have been entitled.

In particular, the State highlights:

- that after she shot Thomas, Defendant prematurely hung up on 911 and did not accept their return calls, and was, according to multiple eyewitness accounts, calm and visibly unbothered in the aftermath of the shooting and seemed "normal" as opposed to being in shock; and falsely told bystanders that she did not know what had happened;
- that a firearms expert testified that the bullet was most likely fired from *outside* Defendant's vehicle, not inside as she claimed; and evidence indicating she did not have enough time to retrieve the gun from its holster (which police found in her driver's door pocket), aim, and fire in the time Thomas was approaching her;
- that despite Defendant's statement that Thomas had begun bringing a gun to every custody exchange, he did not have a gun on the date of his death, and Thomas had recently asked to exchange child custody at the designated safe spot at the Alexandria Police Department ("APD") but Defendant preferred the store parking lot;
- that Defendant told police she could not recall when she purchased her gun, despite it being less than two weeks earlier;
- that there is documented and corroborated evidence of Defendant assaulting Thomas on more than one prior occasion, contrasted with a lack of documented instances of any physical abuse by Thomas toward Defendant, other than her self-serving statements;[6]

---

[6] Former APD Officer Jacob Gomez testified about a report he took while working as an officer in Rapides Parish, on May 28, 2018, in which Thomas reported to him that Defendant slapped him in the face during a custody exchange on May 22, 2018, and presented photos of his injured face. In addition, the report documented a screen shot of a text message allegedly sent by Defendant to a mutual friend of the parties, in which Defendant related: "I just knocked the sh*t out of Thomas. Felt good, too." On cross-examination, it was adduced that Ofc. Gomez did not contact Defendant to get her statement about the report, in part because Thomas had asked him not to. The officer conceded he had experience with persons fabricating reports of violence by estranged partners for purposes of gaining leverage in pending divorce and custody matters.

Former APD Officer Len Hall testified that on August 8, 2018, he investigated another alleged instance of violence by the Defendant against Thomas. According to Hall, Thomas reported that Defendant repeatedly struck him with a closed fist during a custody exchange in the Kroger parking lot, after the car door accidentally bumped into defendant's buttocks. Hall testified that he responded directly to the site at Kroger and personally observed "red markings in his face and

- that in early 2018, Defendant told her longtime friend Jennifer Dennis that she wanted to kill Thomas, and she asked Dennis if she could borrow a gun, and then, after Dennis refused to lend her a gun, Defendant bought one in Texas on August 27, 2018, and sent Dennis a photo of it;
- that Defendant indicated she was not subject to any protective orders on the federal firearm transaction form when purchasing the gun, but she was, and the seller would not have sold her the gun if she had truthfully disclosed the protective order;
- that Defendant bought a self-defense insurance policy after she bought the gun, 12 days before the shooting, and researched self-defense law, including running—and then deleting—several internet searches using the terms "arrested after self defense," "self defense inside car," and "Louisiana Jordan Thornhill,[7] self defense;"
- that on the morning of the shooting, Defendant placed a phone call to Delta Conceal Carry Insurance with a duration of three minutes and two seconds; and
- that Defendant:
    - had bragged to others about hurting Thomas after she assaulted him in August 2018;
    - had bragged to others about using Thomas's bank account to pay bills without his permission;
    - had threatened Thomas in a surreptitiously recorded heated discussion between the two;

a knot above [Thomas's] eyebrow." According to Ofc. Hall, Thomas reported that he did not retaliate and instead "held back" until Defendant ceased hitting him. As with the prior report, the officer did not contact Defendant to obtain a statement because he passed the information up the chain of command and assumed someone else would.

Sgt. Doug Alford of the APD testified about text message evidence recovered from Defendant's phone. Specifically, he described the following, among other, messages sent from her phone, some of which had been deleted, including messages between Defendant and Thomas in which she refused Thomas's inquiries about how their daughter T.C. was doing and Thomas asking Defendant if he could spend more time with the child; a message where Defendant refused to answer Thomas about how T.C. was doing and referred him to contact "Mike" instead; and a message where Defendant advised Thomas she would be blocking his number while T.C. was in her custody to avoid having to communicate with him.

In addition, the jury heard a text message exchange between a Natasha Lacombe and Defendant on August 13, 2018, a few days after Thomas reported being assaulted by Defendant outside the Kroger, in which Lacombe messaged Defendant: "Hopefully his eye is still black," to which Defendant replied: "We had to meet [T.C.]'s teacher this morning. His pride is dead [racial slur] has a black eye."

Defendant's friend Jennifer Thomas testified that Defendant never told her about any abusive behavior by Thomas, but Defendant had shared with her that Thomas was having an affair and that they were getting divorced.

[7] In 2014, a Rapides Parish man was acquitted of murder after shooting an assailant (Thornhill, the shooter's stepdaughter's ex-boyfriend) in self-defense.

o and, on August 2, 2018, deleted her social media accounts, and bragged to a friend about possibly making the news and needing a large sum of bail money.

Given the evidence to refute Defendant's theory, the State argues the jury verdicts must stand. Citing **State v. Gasser**, *supra*, the State asserts the La. R.S. 14:20(B) presumption of reasonableness is not a "license to kill." Instead, "[t]he legislature's decision to use the term 'presumption' rather than a mandatory inference of reasonableness" means the State is entitled to offer proof that the use of deadly force was unreasonable, even if the victim sought to make an unlawful entry.

My review of the parties' competing positions, alongside the language of La. R.S. 14:20 and relevant caselaw indicates the State is correct—Defendant has not presented a sufficient basis to reverse the jury's verdict.

The evidence leaves room for serious doubt about whether Defendant was entitled to the presumption of reasonableness in La. R.S. 14:20(B). For that presumption to apply, Thomas must have been in the process of attempting to unlawfully *and* forcibly enter Defendant's vehicle. The State submits and the court of appeal found, the surveillance video undercuts Defendant's characterization that Thomas made any such forcible attempt. It is my view that the video is open to more than one interpretation.

The video was played for the jury. It was filmed at long range and is of grainy quality. But it shows the parties and their children walking between their parked vehicles during the custody exchange. The three children were moved from Defendant's vehicle into Thomas's vehicle.[8] At the culmination of the exchange, Thomas is seen *walking* back toward Defendant's SUV one last time. The video shows Thomas step into the space between the front driver's side door and the frame

---

[8] Although Defendant and Thomas have just one child together, Defendant's two older daughters were going to spend time with Thomas that day to celebrate their child's birthday.

of the car. It is not clear from the video that Defendant had fully re-entered her vehicle or completely shut her door before Thomas arrived, or that Thomas made any contact with her vehicle, much less that he forcibly "jerked" open her door or did anything that can be described as attempting to *unlawfully and forcibly enter* her vehicle. What occurred while the two were hidden behind the car door is not known. It was up to the jury to view and weigh the evidence to determine what happened.

The autopsy evidence, as testified to by the State's pathologist, Dr. Tape, is likewise equivocal. The autopsy report shows the bullet entered in the center of Thomas's chest and traveled "front to back, right to left and downward" at a 45-degree angle before resting in the muscles of his left flank (i.e. the left lower back). There was stippling surround the entry wound "primarily to the right of and superior to [above] the entry . . ., oriented from 10 o'clock to 4 o'clock." Dr. Tape testified that the stippling indicated that the gun was between three inches and three feet from Thomas was it was fired. He further explained that based on the trajectory of the bullet, he was not able to determine the positioning of the shooter and the victim nor how the shooter was holding the gun because "people can hold the gun in all kinds of ways."

On cross-examination Dr. Tape agreed that the path of the bullet and the stippling along the top and right edge of the wound could indicate Thomas was leaning toward Defendant when he was shot. However, the pathologist qualified that statement by also testifying that the trajectory evidence was "consistent with a million things."

Since the surveillance video and autopsy evidence are equivocal, viewing it in the light most favorable to the prosecution, the jury could have rationally concluded that Thomas was not unlawfully and forcibly entering Defendant's

15

vehicle when she shot him. Thus, I would find the presumption of reasonableness in La. R.S. 14:20(B) is inapplicable.

Because the jury could have rationally concluded Thomas was not in the process of unlawfully and forcibly entering Defendant's vehicle, I also find the jury acted rationally to the extent that it found this case fell outside La. R.S. 14:20(A)(4)(a) and therefore that Defendant had no right to stand her ground using lethal force. There are also other reasons why the jury could have rationally found the justification defense disproven.

Even assuming *arguendo* that the evidence squarely put Defendant's actions within (A)(4)(a) and R.S. 14:20(B), the question would still be whether the State rebutted the presumption of reasonableness and presented sufficient evidence that Defendant did not reasonably believe the use of deadly force was necessary. The **Ingram** court (in a case where the victim had undisputedly entered the accused's home unlawfully and forcibly) explained:

> Although the legislature has the power to expand the justifiable homicide defense to conclusively declare the use of deadly force reasonable in every case of unauthorized entry, it has not done so. Instead, the legislature clarified and expanded the "reasonable and necessary" requirement in La. R.S. 14:20(A) with the use of the "presumption" language in La. R.S. 14:20(B). The statute says that there "shall" be a presumption of reasonableness but not that the presumption is irrebuttable.
>
> With the presumption, the law recognizes that forcible entry situations often develop quickly and may present a threat of harm that allows little time for a homeowner to carefully weigh his options in defending himself. As Justice Holmes famously stated in a related context, "Detached reflection cannot be demanded in the presence of an uplifted knife." **Brown v. United States**, 256 U.S. 335, 343, 41 S.Ct. 501, 502, 65 L.Ed. 961 (1921). However, the presumption of reasonableness in La. R.S. 14:20(B) is not a license to kill. The legislature's decision to use the term "presumption" rather than a mandatory inference of reasonableness means that the State is entitled to offer proof that a person's use of deadly force was unreasonable even in cases where the victim has made unlawful entry into the Defendant's home. If the State can prove beyond a reasonable doubt that the use of force was unreasonable, the Defendant may still be guilty of homicide.

**Ingram**, 45,546, pp. 9–10, 71 So.3d at 444–45.[9]

Relevant to the State's burden of proving that Defendant acted unreasonably, the parties dispute several points. Defendant emphasizes that the length of time between Thomas arriving at her door and falling back was between three to four seconds, and urges this is consistent with her claim that she reacted in fear. But she merely contradicts the testimony from the crime scene investigator and detective indicating she would have been hard-pressed to remove her gun from its holster inside her driver's door pocket—which she alleges had just been pulled open and away from her—turn outward toward Thomas, aim, and fire in such a short span. Instead, as I pointed out above, the surveillance footage indicates the jury rationally credited the State's theory that she acted pursuant to a premeditated plan to kill Thomas.

As to evidence of premeditation, Defendant seeks to minimize the significance of her telling her friend that she wanted to kill Thomas, stating she did not make the statement "weeks before" the shooting, as the appellate opinion described, but at the start of 2018, *months* earlier. Defendant seeks to cast her statement as a "passing comment" to a friend and not a serious expression of homicidal intent, but in so doing, she asks this court to usurp the jury's role and reweigh testimony from a cold record. It was for the jury to hear Dennis's account firsthand and decide its significance, and I do not find the discrepancy Defendant cites in the court of appeal's opinion a basis for overturning the jury's verdicts. See **State ex rel. Graffagnino v. King**, 436 So.2d 559 (La. 1983) (credibility of witness testimony and weight to be attributed are matters for the jury alone to decide).

---

[9] This approach is akin to the proportionality assessment when a defendant claims justification under the more commonly invoked provision at La. R.S. 14:20(A)(1), under which a "homicide is justifiable[ w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger."

Moreover, Defendant ignores evidence that she also asked her friend to borrow a gun, which indicates she was doing more than just joking. When her friend declined to lend her a gun, Defendant told her she would buy her own, which she later did. Defendant then sent the friend a photo of the gun after buying it. Notably, this latter conduct and communication was *within weeks* of the shooting.

Defendant argues her purchase of a self-defense insurance policy and researching self-defense law was innocent conduct by a responsible gun owner, which the State has distorted to make her look bad. Even granting that these acts may be viewed in isolation as neutral, she does not acknowledge the impact of the other evidence indicating she took steps to hide her research. Forensic analysis shows she entered and *later deleted* search terms such as "self defense inside car" and "arrested after self defense," and sought information about how another person had escaped criminal liability in Louisiana for shooting someone, all searches performed on her devices in August 2018, the month before she killed Thomas.

Finally, Defendant does not acknowledge the significance of her phone call to the insurance company on the morning of the shooting, or that she told the investigator who first interviewed her that she could not recall when she bought the gun, despite it being less than two weeks earlier. It was for the jury to decide what inferences to draw from these details in assessing the reasonableness of her conduct.

In sum, although Defendant's self-serving statements alone portray a narrative adjacent to La. R.S. 14:20(A)(4)(a), in that she was in her vehicle when she claims Thomas forcefully opened her door, I find the State presented sufficient other evidence to rebut her claim that she reasonably believed deadly force was necessary to prevent his entry or compel him to leave. The jury was well aware that Defendant was smaller than Thomas, and that she claimed to have seen Thomas carrying a gun on prior occasions. The jury was also aware that Thomas was not armed at the time

of his death and that no gun was found in his vehicle. Although not dispositive, the absence of a weapon from the victim's person or immediate reach is an indicator of what threat he posed. **State v. Domingue**, 17-0786, p. 5 (La. App. 3 Cir. 4/18/18), 244 So.3d 489, 493.

Defendant repeatedly asserted she was fearful of Thomas in her post-arrest interview, but the State correctly notes that the only corroborated instances of abuse were by the Defendant against Thomas, not the other way around. There was also evidence that she had recently bragged about harming Thomas, made private comments about possibly making the news and needing a fundraiser for bail money, researched scenarios similar to what ultimately transpired, deleted her social media accounts, and took other steps to cover her tracks.

Although a person claiming justification under the stand-your-ground law has no duty to retreat, "[t]he unavailability of the retreat defense does not end the inquiry into the reasonableness of the use of force even when the accused is in his own home." **State v. Steinle**, 12-0053, p. 8 (La. App. 3 Cir. 10/3/12), 98 So.3d 973, 978, *writ denied*, 12-2390 (La. 5/31/13), 118 So.3d 387; **Ingram**, 45,546, p. 10, 71 So.3d at 445. It was for the jury to decide whether the State negated self-defense beyond a reasonable doubt. **State v. Griffin**, 14-0450, pp. 7–8 (La. App. 5 Cir. 12/16/14), 167 So.3d 31, 38, *writ denied*, 15-0148 (La. 11/20/15), 180 So.3d 315. Viewing the evidence in the light most favorable to the State, I find the jury could rationally conclude that the State rebutted the presumption of reasonableness and proved beyond a reasonable doubt that Defendant did not justifiably use lethal force. The jury was forced to make credibility determinations to resolve equivocal evidence and competing theories, and I cannot say the jurors had an insufficient basis to credit the State's case.

19

The record also supports a finding that there was sufficient evidence for Defendant's obstruction conviction. Obstruction of justice includes tampering with evidence with specific intent to distort a criminal investigation, and with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding, including moving or removing evidence the perpetrator knows or has good reason to believe will be the subject of any investigation. La. R.S. 14:130.1(A)(1).

Evidence shows Defendant transferred her laptop to her sister two weeks before the shooting and later asked her in a recorded jail call to give it to a friend. Although there was no evidence of Defendant asking anyone to destroy evidence, her efforts to transfer and conceal the computer, which contained her deleted research on self-defense law and personal correspondence boasting she may make the news and need a fundraiser for bail money, support a finding that she unlawfully removed the computer from her home, where it naturally would have been, and deleted data from her phone and laptop for the purpose of distorting a possible investigation of the shooting.

Defendant argues she innocently researched how to be a responsible gun owner, but she does not point to any evidence that could reasonably explain why her histories were deleted, nor why she deleted her social media accounts in the weeks before the shooting. The jury was entitled to credit the State's theory that she used her phone and laptop to prepare for the shooting and then deleted the histories and transferred the laptop to a trusted person to impede an investigation. The trier of fact makes credibility determinations, and may within the bounds of rationality, accept or reject any testimony, including the testimony she told Dennis she wanted to kill Thomas and asked others to keep her computer at bay. See **State v. Mussall**, 523 So.2d 1305, 1310 (La. 1988); **State v. Rosiere**, 488 So.2d 965, 969 (La. 1986).

20

Specific intent can be inferred from actions seeking to distance oneself from evidence of wrongdoing or premeditation. **State v. Bishop**, 01-2548 (La. 1/14/03), 835 So.2d 434 (specific intent may be inferred from the circumstances surrounding the offense and the conduct of the accused). The inquiry is whether there is sufficient evidence to support a rational decision to accept the State's theory of guilt. Here, the jury chose to credit the State's version of events, and the record shows sufficient evidence to support their decision.

## II. Challenges to jurors.

Defendant argues her convictions must be overturned because of jury selection errors. First, she points to prospective juror Wilfred Loewer whom she challenged for cause because she claims he exhibited an inability to remain impartial. She also points to prospective juror Brandon Headrick, whom she argues was erroneously empaneled despite problematic statements indicating reluctance or inability to follow the stand-your-ground law.

After review of the record, I agree with the court of appeal that the trial court did not abuse its discretion when it decided Mr. Loewer could set aside his familiarities and decide the case impartially based on the evidence and instructions provided by the trial court. The trial court based its decision on firsthand observations of Loewer's demeanor and credibility. As to Mr. Headrick, the only indication in the record that he may have had difficulty applying the law arose as a result of defense counsel's characterization of the law which understated La. R.S. 14:20(A)(4)(a)'s reasonableness requirement and, without explaining that aspect of the law, asked prospective jurors to embrace a hypothetical without details as to whether the person doing the shooting *reasonably* believed it was necessary, as required by law. The record also disproves Defendant's claim that Headrick never said he could apply the law as instructed. Given the trial court's thorough interview

with Headrick to verify his ability to set aside preconceptions and apply the law as given by the court, I find there was no abuse of discretion in denying the challenge to this juror.[10]

For the foregoing reasons, I would affirm the court of appeal's decision upholding Defendant's convictions. Therefore, I respectfully dissent.

---

[10] Defendant also argues that foreperson was undesirable to the defense because of familiarities with the victim. The third circuit correctly found she failed to preserve this claim for review. **Coutee**, 22-665, p. 12, 373 So.3d at 496.

# SUPREME COURT OF LOUISIANA

## No. 2023-K-01549

## STATE OF LOUISIANA

## VS.

## KAYLA JEAN GILES COUTEE

On Writ of Certiorari to the Court of Appeal, Third Circuit, Parish of Rapides

**CRAIN, J.**, concurs and assigns reasons.

Under the facts presented, application of the aggressor doctrine and the stand your ground law are mutually exclusive. The stand your ground law set forth in La. R.S. 14:20 provides that a homicide is justifiable:

> When committed by a person lawfully inside of a dwelling, a place of business, or a *motor vehicle* as defined in R.S. 32:1(40) when the conflict began, against a person who is attempting to make an unlawful entry into the dwelling, place of business, or motor vehicle, or who has made an unlawful entry into the dwelling, place of business, or motor vehicle, and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the dwelling, place of business, or motor vehicle.
> La. R.S. 14:20(A)(4)(a). (Emphasis added).

La. R.S. 14:20(B) creates a presumption that a person lawfully inside a motor vehicle has a reasonable belief that the use of deadly force is necessary to prevent the unlawful entry when both of the following occur: (1) the person against whom deadly force was used was in the process of unlawfully and forcibly entering and (2) the person who used deadly force knew or had reason to believe than an unlawful and forcible entry was occurring.

When making a stand your ground claim, La. R.S. 14:20(C) and (D) clarify that:

A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have *no duty to retreat* before using deadly force as provided for in this Section, and may stand his or her ground and meet force with force.

*No finder of fact shall be permitted to consider the possibility of retreat* as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary . . . to prevent the unlawful entry.
(Emphasis added).

In contrast, the aggressor doctrine set forth in La. R.S. 14:21 provides:

A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense *unless he withdraws* from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
(Emphasis added).

Thus, La. R.S. 14:20 and 14:21 contemplate two distinctly different scenarios. One, where the accused is forced to defend herself while lawfully within her own space and, another, where the accused is forced to defend herself after first invading the space of another in some manner. Here, the shooting occurred after the defendant was approached in her own vehicle. There are no facts suggesting defendant was the aggressor as applied under La. R.S. 14:21. Thus, it was legal error to instruct the jury on it.

Once legal error is found, it must be considered against the harmless-error test, which requires "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). La. R.S. 14:21 denies the right of self-defense unless the accused "withdraws." La. R.S. 14:20 provides for a stand your ground defense while recognizing "no duty to retreat." Under the facts presented, these legal theories are in conflict. The conflicting jury instruction created a high likelihood of confusion. Therefore, I concur in the decision to vacate the defendant's murder conviction and sentence and remand for a new trial.

2

SUPREME COURT OF LOUISIANA

No. 2023-K-01549

STATE OF LOUISIANA

VS.

KAYLA JEAN GILES COUTEE

On Writ of Certiorari to the Court of Appeal, Third Circuit, Parish of Rapides

**Guidry, J. dissents and assigns reasons.**

The majority and the concurring opinions inaccurately construe and describe the ruling of the jury in this case. The jury did not "presuppose" that the defendant was the aggressor because she had her weapon at the ready. Rather, the jury in this case was clearly persuaded by the substantial circumstantial evidence indicating that the defendant deliberately planned and orchestrated the deadly encounter with the victim to reject the defendant's "stand-your-ground" defense.

The evidence presented by the State established that the defendant did not merely research her "stand-your-ground" rights, but she specifically researched cases in which people were able to successfully use such a defense. Prior to the shooting, the defendant told a friend that she wanted to kill the victim, then sought to borrow a gun from the friend, and when the friend refused, purchased one herself. The video of the shooting does not show the victim behaving aggressively as the majority and the defendant would suggest. Instead, the video shows the victim walking casually to the defendant's car. Following the shooting, witnesses testified that the defendant appeared calm and unbothered. One of the investigating officers with firearms experience testified that based on the trajectory of the discarded bullet casing, which was found outside the vehicle, the defendant most likely fired the gun from outside the vehicle and not inside as she claimed. Moreover, the evidence presented to the jury showed that the defendant was less than forthright regarding the circumstances whereby she acquired the gun with which she shot the victim, and

she even sought to hinder discovery that her actions were planned by deleting her social media accounts, deleting her internet search history, and giving away her laptop just two weeks before the shooting. Finally, while the majority opinion highlights the defendant's uncorroborated claims of domestic abuse, it makes no mention of contrary evidence wherein several witnesses testified not only about how the defendant was the perpetrator of physical assaults against the victim, but that she bragged about such assaults.

Hence, while the defendant was well within her rights to own and possess a gun and to stand her ground and protect herself with it, she was not entitled to orchestrate a situation wherein she might falsely exercise those rights. It was the province of the jurors to weigh the evidence presented to them and determine whether the defendant was justified in the fatal action that she took. The jury weighed the testimony and rejected the defendant's stand-your-ground defense, instead crediting the State's theory that the defendant premeditated the victim's killing and took steps to fabricate the justification defense. See State ex rel. Robinson v. Vannoy, 21-00812, p. 1 (La. 1/26/24), 378 So. 3d 11, 53 (McCallum, J., dissenting), opinion vacated and superseded on reh'g, 021-00812 (La. 12/13/24), 397 So. 3d 333, reh'g granted, 21-00812 (La. 3/20/25), 403 So. 3d 530. The defendant had a fair trial that resulted in her convictions. See State ex rel. Robinson, 21-00812 at p. 6, 378 So. 3d at 53 (Crain, J., dissenting). Accordingly, I dissent and would affirm the convictions.